BAYLE et al. v. NORRIS et al.†
(Court of Civil Appeals of Texas. Feb. 2, 1911. Rehearing Denied Feb. 23. 1911.)

1. APPEAL AND ERROR (§ 882*)—INVITED ERROR.

Plaintiffs, in an action for cutting timber from their land, who described the land in their petition as a parallelogram constituting the south quarter of a certain league, cannot object on appeal that the court did not find the land to be a parallelogram in the southwest corner.

[Ed. Note.—For other cases, see Appeal and Error. Cent. Dig. §§ 3591–3610; Dec. Dig. § 882.*]

2. APPEAL AND ERROR (§ 1008*)—FINDINGS—CONCLUSIVENESS.

Findings of fact by the trial court on an issue raised by the evidence are conclusive on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3955–3969; Dec. Dig. § 1008.*]

3. TROVER AND CONVERSION (§ 46*)—DAMAGES—MEASURE.

Where defendant takes property of plaintiff willfully or with culpable negligence in not knowing the true ownership, the measure of damages is the value at the time of demand, and if the property has been altered by manufacture, the value in its manufactured state may be recovered; but if the taking was under belief of title in good faith, and not culpably negligent, the measure of damages is the value at the time and place of taking.

[Ed. Note.—For other cases, see Trover and Conversion, Cent. Dig. § 263; Dec. Dig. § 46.*]

4. PLEADING (§ 236*)—AMENDMENT—TIME FOR AMENDMENT—DISCRETION OF COURT.

Sayles' Ann. Civ. St. 1897, arts. 1188, 1189, require amendments to pleadings, when the court is in session, to be filed by leave and before the parties answer ready for trial, and that they must be filed long enough before trial not to surprise the opposite party. After plaintiffs' motion for a continuance had been denied, defendants announced ready for trial, and plaintiffs who were suing for damages for cutting timber, then moved to be allowed to amend their petition so as to describe a materially different tract of land. The question of title was in issue. Held, that refusal of leave to amend was no abuse of discretion.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. § 601; Dec. Dig. § 236.*]

5. DESCENT AND DISTRIBUTION (§ 71*)—PRESUMPTION FROM NONCLAIM — RECEIPT OF SHARE.

Eight, out of eleven heirs of a deceased owner of land, conveyed a specific tract of the land in 1842. The other three heirs were daughters, one of whom also joined in the deed, but failed to convey her interest because of a defective acknowledgment, she being married. The other two never conveyed their interest. Held, that the fact that no claim was ever made by either of the three to any of the tract con-

veyed raised no presumption that their share of the inheritance was satisfied out of the rest of the land of their ancestor.

[Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig. § 233; Dec. Dig. § 71.*]

6. ADVERSE POSSESSION (§ 44*)—CONTINUITY OF POSSESSION.

Where possession was taken of land under claim of title in 1887 and houses, cribs, fences, etc., built thereon, and the occupant lived there and raised crops on some part of the land annually till 1899, when he rented it, and kept it rented to various tenants, who raised crops on the land every year up to and including 1905, there was no break in the actual occupancy except that incident to a change of tenants, and never for more than two months at a time. *Held* to establish continuous possession sufficient to confer title by adverse possession.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 226–231; Dec. Dig. § 44.*]

Appeal from District Court, Harris County; W. P. Hamlen, Judge.

Action by Joseph Bayle and others against W. H. Norris, receiver, and others. From a judgment for insufficient relief plaintiffs appealed, and defendants assigned cross-errors. Reversed and rendered in part; reformed and affirmed in part.

W. D. Gordon, for appellants. Spotts & Matthews, for appellees.

McMEANS, J. Joseph Bayle and his co-plaintiffs brought this suit against W. H. Norris, receiver of the Tyler County Land & Lumber Company, to recover damages in the sum of $35,000, alleged to have been sustained by them by reason of the defendant having unlawfully cut and removed from land alleged to belong to plaintiffs 5,000,000 feet of pine timber, which they alleged he manufactured into lumber and appropriated to his own use, the sum so sought to be recovered being the value of the timber after it was manufactured into lumber.

Plaintiffs alleged that they were the owners in fee simple of the land from which the timber was taken and describe the same in their petition by the following field notes: "The south one-fourth of the Mary Thomas league in Polk county, Texas. * * * Beginning at the southwest corner of the said Mary Thomas League; thence north 50 deg. W. 1,332.5 varas, more or less, to corner on west line of said Mary Thomas League; thence N. 70 deg. E. 5,330 varas, more or less, to the east line of said Mary Thomas League. Thence S. 50 deg. E. 1,332.5 varas, more or less, to the S. E. corner of said Mary Thomas League; thence S. 70 deg. west 5,330 varas, more or less, to the S. W. corner of said Mary Thomas league to the place of beginning containing 1,107 acres of land more or less."

The defendant filed an answer to the suit vouching in certain warrantors, alleging that he, as receiver, had purchased the timber from these warrantors on the specific tracts, which he described in his answer. He set up that these warrantors had conveyed him the timber and that they had a right to do so, having acquired title to the lands by adverse possession, and he pleaded their limitation titles in defense of the plaintiffs' suit, and in the alternative for judgment against the warrantors for the value of the timber conveyed to him by the deeds of the settlers. He also set up that, as receiver of the said Lumber Company, and of the Railway Company, which really was the tram used by and in connection with the Lumber Company, it was impossible for him to give his personal attention to the purchase of all the timber necessary to the operation of the mill in his charge, and that he had employed careful agents, who made the purchases and upon whose judgment in making the same, he was compelled to rely and did rely. He alleged that these agents made diligent inquiry as to the nature of the title from those from whom they purchased and believed and so reported to the defendant that good titles to the timber purchased were acquired by the purchases set out in the answer, and that, so believing, he caused the timber to be cut for use in the mill, in good faith, and hence, that if plaintiffs were entitled to recover anything they should recover only the value of the trees.

The warrantors brought in by the receiver were B. W. Wiggins, from whom defendant alleged he had purchased the timber on two tracts of 160 acres each, and who answered by general denial and plea of not guilty; J. C. Salter, A. D. Salter, J. G. Masterson, and W. C. Stockley, from whom defendant alleged he had purchased the timber on a tract of 152 acres, who did not answer, but suffered judgment by default; J. M. Mullins and wife, and Mrs. E. Mullins, who answered by general denial and pleas of not guilty. The case was tried before the court without a jury, and resulted in a judgment in favor of plaintiffs against defendant Norris for $1,205.91, being the value of the timber taken from the most western of the tracts conveyed by B. W. Wiggins to defendant and for the value of the timber sold to defendant by the Salters, Masterson, and Stockley, and denied plaintiffs a recovery for the value of the timber as manufactured into lumber, and also denied them a recovery for the value of the timber sold defendant by Wiggins on the other tract of 160 acres, and for the value of that sold to him by J. M. Mullins and wife and Mrs. E. Mullins, or for any other timber taken from the land. Judgment was also rendered for defendant over against B. W. Wiggins and the Salters, Masterson and Stockley on their covenants of warranty. From the judgment, the plaintiffs appeal, and the receiver, Norris, filed cross-assignments of error.

The trial judge upon proper request filed

his findings of fact and conclusions of law, which are as follows:

"(1) That the said Mary Thomas League mentioned in the pleadings in this cause was granted to Mary Thomas in 1835. The north and south lines of said survey are parallel and run north 70 degrees east, and the east and west lines thereof are parallel and run north 50 degrees west. Each line of the survey is 5,330 varas in length and Big Sandy creek runs through the survey crossing the north line thereof nearer to the northeast corner than to the northwest corner thereof, and passing out of said survey across the south line thereof about 600 or 800 varas south, 70 degrees west, from the southeast corner thereof.

"(2) That said Mary Thomas died prior to the 2d day of September, 1842, leaving surviving her 11 children and heirs, viz., Wiley S. Thomas, Benjamin Thomas, A. Jackson Thomas, I. D. Thomas, Anna Thomas, Theophilus Thomas, S. D. Thomas, G. L. Thomas, Maria N. Roberts, wife of N. G. Roberts, Margaret Davis, the wife of E. K. Davis, and a daughter named ———, who married ——— Brownrigg.

"(3) All of the above-named children of Mary Thomas, except the two last named, and S. D. Thomas, on September 2, 1842, executed to S. D. Thomas a deed conveying to him the lower quarter of said league. This deed was signed by Maria Roberts and her husband, Noel G. Roberts, but it did not appear that her acknowledgment thereto was taken in accordance with the statute, the certificate of acknowledgment not showing that she was examined separate and apart from her husband, or that the instrument was explained to her, or that she declared that she did not wish to retract, but showing that her acknowledgment was taken as though she were a femme sole.

"(4) On March 5, 1846, said S. D. Thomas by S. W. Blount, attorney in fact, under a power of attorney, which was introduced in evidence, conveyed to Jacinto Aleix the lower quarter of the league.

"(5) Jacinto Aleix died January 2, 1861, and on the 13th day of July, 1872, his children conveyed to his surviving wife, Severinne Aleix, the lower quarter of said league, describing it as beginning on the southwest boundary thereof 2,665 varas south 50 degrees east from the most western corner of the league, and running thence north 70 degrees east 2,665 varas. Thence south 50 degrees east 2,665 varas to the southeast boundary line of the league. Thence south 70 degrees west with the east line of said league 2,665 varas to its most southern corner. Thence north 50 degrees west with the southwest line of said league 2,665 varas to the beginning, calling for marked bearing trees at each corner of the quarter, and calling for branches where the lines cross them.

"(6) Severinne Aleix, the widow of Jacinto Aleix, died on the ——— day of ———,

1873, and left surviving four children, viz., Edward, who is still living, Oscar, Leopold and Mary Amanda, wife of Joseph Bayle. Oscar married and died leaving surviving his widow, but no children.

"(7) On April 20, 1882, Edward Aleix conveyed to Leopold Aleix his interest in said lower quarter of said league, describing it by the same field notes given in said deed from the children of Jacinto Aleix to their mother, Severinne Aleix.

"(8) Leopold Aleix and Mrs. Bayle died before the institution of this suit, and all of their children except one are the plaintiffs in this suit, it being conceded on the trial by both plaintiffs and defendants that with the exception of that part of the land to which their rights are barred by limitation, they are the owners of $19/24$ of such part of or interest in the land as Jacinto Aleix acquired through the deed to him from said S. D. Thomas.

"(9) From the year 1848 to the year 1900, with the exception of about six years, the said Jacinto Aleix paid taxes on 1,107 acres of said survey or redeemed the same from tax sales thereof.

"(10) About 1856, Jacinto Aleix had surveyed one quarter of said league. The field notes of said survey were introduced in evidence by plaintiffs, and they are the same as the field notes contained in the said deed from the heirs of said Jacinto Aleix to their mother, Severinne Aleix, and in said deed from Edward Aleix to Leopold Aleix.

"(11) There has never been any possession of any part of said Mary Thomas survey by Jacinto Aleix or any of his heirs, nor have any of them ever been on the land, except the plaintiff, Joseph Bayle, who inspected the land some eight or ten years since, but what part thereof he inspected does not appear.

"(12) That for more than 10 years and for about 14 years prior to the date of the deed executed by J. M. Mullins to W. H. Norris, receiver of the Tyler County Land & Lumber Company, conveying the pine timber situated on 160 acres of land out of said Mary Thomas survey, which tract of land and said deed are described in the first amended original answer herein of said Norris, as such receiver, the said J. M. Mullins claiming to have good and perfect title to said 160 acres of land, had held peaceable, continuous, and adverse possession thereof, cultivating, using, and enjoying the same, and paying all taxes thereof, and after the expiration of said period and after the execution of said deed to him, the said Norris, as such receiver, cut the timber thereon which had been sold to him as aforesaid, the amount so cut being 306,-505 feet, of the value of three hundred and six and $50/100$ dollars.

"(13) That on the 7th day of September, 1907, B. W. Wiggins by his deed of that date conveyed to W. H. Norris, receiver of the Tyler County Land & Lumber Company, the

134 S.W.—49

pine timber on two certain tracts of land out of said Mary Thomas survey, both of which tracts of land and said deed are described in the said first amended original answer of said Norris as such receiver; that for more than 10 years, and for about 15 years before the execution of said last-mentioned deed, the said B. W. Wiggins and those through whom he claimed same, claiming to have good and perfect title to the 160-acre tract first described in said deed, had held peaceable, continuous, and adverse possession thereof, cultivating, using, and enjoying the same, and paying all taxes thereon, but had not exercised such acts of ownership over the last tract described in said deed as to entitle.him to hold same under the statutes of limitation; that after the execution of said deed to him by said B. W. Wiggins he, the said Norris, as such receiver, cut the pine timber on both of the tracts of land so conveyed to him by said B. W. Wiggins, the amount of timber cut by him on the tract of land first described in said deed being 882,-183 feet, of the value of $882.183, and that cut on the tract of land last described being 949,920 feet of the value of $949.920, said values being the market values of the timber as it stood in the trees at the time the same was cut on said two tracts of land.

"(14) That on the 29th day of August, 1906, J. C. Salter, A. D. Salter, J. G. Masterson, and W. C. Stockley, by their deed of that date, conveyed to said W. H. Norris, as receiver as aforesaid, the pine timber on a certain 152-acre tract of land out of said Mary Thomas survey, which tract of land and deed are described in first amended original answer of said Norris, as such receiver. That for the greater part of the time for 15 years before the execution of said deed, the said J. C. Salter, A. D. Salter, J. G. Masterson, and W. C. Stockley, and those through whom they claimed same, claiming to have good and perfect title to said 152-acre tract of land, had and held an adverse possession thereof, cultivating, using, and enjoying the same broken and not continuous, but not such continuity of possession thereof as to entitle them to hold same under the statutes of limitation and after the execution of said deed the said Norris, as such receiver, cut the pine timber thereof, the amount so cut being 573,337 feet, of the value of $573.33, such being the market value of the timber of said land as it stood in the trees at the time the same was cut.

"(15) That on the 22d day of January, 1906, Mrs. E. Mullins by her deed of that date conveyed to W. H. Norris, as receiver as aforesaid, the pine timber on a certain tract of 160 acres of land out of said Mary Thomas league, which tract is described in the field notes thereof introduced in evidence and which is situated west of the tract so conveyed by said J. M. Mullins to said Norris as such receiver, and east of the tract first described in said deed from B. W. Wiggins to said Norris, as such receiver; that for more than 10 years and for about 14 years before the execution of said deed last mentioned, the said .Mrs. E. Mullins, and those through whom she claimed same, claiming to have a good and perfect title to the said last-mentioned 160-acre tract of land, had held peaceable, continuous, and adverse possession thereof, cultivating, using, and enjoying the same, and paying all taxes thereon, and after the execution of said deed by said Mrs. E. Mullins, he, the said Norris, as such receiver, cut the pine timber on said last-mentioned tract of land, the amount of timber so cut thereon being 129,224 feet, of the value of $129.22.

"(16) That all the pine timber cut by said Norris as such receiver on any of the lands claimed by plaintiffs, was that so conveyed to him by said B. W. Wiggins, J. M. Mullins, Mrs. E. Mullins, J. C. Salter, A. D. Salter, J. G. Masterson, and W. C. Stockley; that before said conveyances were made and before said timber was cut the said Norris, as such receiver, exercised such care and diligence as a prudent person would exercise under the same circumstances to ascertain the true ownership of the timber, and acting under such information as he obtained in regard to such ownership, and on the advice of counsel whom he had employed to ascertain the ownership, he purchased such timber and paid what at the time of the purchase thereof was the value thereof, and believing in good faith that by said purchase he became the owner of said timber he afterwards cut the timber so purchased by him; that upon the execution of said deeds to said Norris as such receiver by these made defendants herein by him, or as said timber was cut, he, the said Norris as such receiver, paid to the respective parties executing such deeds the amounts named in his answer as paid to them.

"(17) That the grantors in the said deeds from Wiley S. Thomas and others to S. D. Thomas, and the grantor in the deed from S. D. Thomas by his attorney in fact to Jacinto Aleix intended to convey the land described in plaintiff's petition herein, being the south half of the south half of said league, and did not intend to convey the southwest quarter of said league as contended by plaintiffs on the trial, and did not intend to convey the southeast quarter of said league as contended by the defendants on the trial.

"Conclusions of Law.

"(1) That though said deed from Wiley S. Thomas and others to S. D. Thomas did not convey the interests of Maria N. Roberts, Margaret Davis, or Mrs. Brownrigg in the land therein described, each of them then owning an undivided one-eleventh thereof, yet, as it does not appear from the evidence

that they have ever asserted any claim thereto since the execution of said deed in 1842, it must be now presumed that they have in some way received their full shares or interest in said league out of other portions thereof than the lower quarter thereof, and therefore Jacinto Aleix and those claiming through him have acquired the title of all the heirs of Mary Thomas to said lower quarter of said league.

"(2) That the plaintiffs are not entitled to recover of W. H. Norris as receiver of the Tyler County Land & Lumber Company on account of the timber cut by him on the tracts claimed by J. M. Mullins, Mrs. E. Mullins, or on the tract first described in the deed to him from B. W. Wiggins, but are entitled to recover nineteen twenty-fourths ($19/24$) of the value of the timber cut on the tract last described in said deed from B. W. Wiggins, being the most western of the two tracts so conveyed by B. W. Wiggins, such nineteen twenty-fourths ($19/24$) of such value being $752 and are also entitled to recover nineteen twenty-fourths ($19/24$) of the value of the timber cut on the 152-acre tract described in said deed from A. D. Salter, J. C. Salter, J. G. Masterson and W. C. Stockley, such $19/24$ of said value being $453.91, said values so fixed being the market value of the timber as it stood in the trees at the time the same was cut. The defendant W. H. Norris, receiver of the Tyler County Land & Lumber Company, is entitled to recover of B. W. Wiggins the sum of $752 on account of the covenants of warranty contained in his said deed, and is entitled to recover of the said J. C. Salter, A. D. Salter, J. G. Masterson and W. C. Stockley the sum of $453.91 on account of their covenants of warranty contained in their said deed."

Appellants' first and second assignments of error are as follows:

"The court erred in not holding that the land owned by plaintiffs and denominated the lower quarter of said Mary Thomas league was that described in the fifth finding of fact, to wit, beginning on southwest boundary of the said league 2,665 varas south 50 degrees east from the most western corner of the league; thence north 70 degrees east 2,665 varas. Thence south 50 degrees east 2,665 varas to the southeast boundary line of the league. Thence south 70 degrees west to the east line of said league 2,665 varas to the most southern corner. Thence north 50 degrees west with the southwest line of said league 2,665 varas to the beginning; and in not adjudging the case accordingly."

"The court erred in finding 17 in holding that the plaintiffs' land was not located as designated in assignment of error No. 1, but extended in a parallelogram across the southeast portion of said league, parallel with the said southeast line."

If the court committed error in the re-gard complained of in the above assignments it was an error of which the appellants should not now be heard to complain. They described the land as being the south one-fourth of the league, and the field notes set out in their petition show the land to be a parallelogram 1,332 varas wide and 5,330 varas in length, and extending entirely across the league. It was not contended in their pleadings that the quarter of a league owned by them was its southwest quarter. The description given in the petition could not in any way be applied to the boundaries of the southwest quarter, which are given in the court's fifth finding of fact which describes that quarter as having lines of equal length, each being 2,665 varas long. The assignments cannot be sustained.

The third assignment complains that the court erred in not holding that the possession of the B. W. Wiggins tract mentioned in the thirteenth finding of fact was insufficient to mature title under the 10-year statute of limitation, because, he contends, said Wiggins, and his father, under whom he claimed, lived entirely east of the southwestern quarter of the land designated in the fifth finding of fact, and that there was not sufficient possession of any of plaintiffs' land to form the basis of title by limitation.

This assignment is predicated upon the assumption that plaintiffs owned the southwestern quarter of the league which had been segregated from the balance, and that while Wiggins' lines extended from the southeastern quarter across the division line into the southwestern quarter, all his improvements and his actual possession were upon the former. If this contention was borne out by the testimony we think the assignment should be sustained. It appears from the evidence that the children and heirs of Jacinto Aleix, after the death of their father, conveyed, by metes and bounds, the southwestern quarter of the league to their mother, Severinne Aleix, and that the field notes used in this conveyance were those furnished by a surveyor who had made the survey at the instance and during the lifetime of Jacinto Aleix. The plaintiffs held title as heirs of Severinne Aleix. There was proof that the land claimed by Wiggins was east of this line and that most of his improvements, if not all of them, including the house he lived in, were east of the east line of the southwestern quarter of the league. But, on the other hand, there was testimony to the effect that Wiggins' home, barns, inclosure, and other improvements were west of this line and entirely on the southwestern quarter. This is notably true as to the testimony of B. W. Wiggins, who testified that he was familiar with the line that had been run north 50° west from the middle point on the south line of the league, which is the east line of the southwestern quarter, and that his house was west of that line, but the line cuts off about 20 feet of the 160-acre

772    134 SOUTHWESTERN REPORTER    (Tex.

tract he lived on. This testimony raised an issue of fact to be decided by the court, and the court's determination of the issue against the plaintiffs is conclusive upon us. The assignment is overruled.

The fourth and fifth assignments are addressed to the action of the court in restricting plaintiffs' right of recovery to the value of the timber at the time and place it was taken, and in not allowing, as the measure of recovery, the value of the timber in its manufactured state.

Upon this issue it was shown that the timber taken by defendant was from two tracts of 160 acres each purchased by him from B. W. Wiggins, and from a tract of 152 acres purchased from the Salters, Masterson and Stockley, and from the two tracts purchased from the Mullinses. Appellant makes no question as to the title of the tracts held by the parties last named having been perfected in them by limitation, nor as to one of the 160-acre tracts purchased from Wiggins other than as raised in his third assignment which has been hereinbefore discussed, so that the defendant's liability rests upon his good faith, or rather the want of it, in taking the timber from the other 160-acre Wiggins tract and from the 152-acre tract of Salters, Masterson and Stockley. Upon this issue the following testimony was introduced. Norris, the defendant, testified: "I have been out to the land several times, and had a superintendent there. When I cut the timber I did not know that there were no limitation claimants to the part of the land outside of the Wiggins tracts. My instructions were to cut what timber belonging to the different parties we bought from; they had title to it by limitation. Mr. Mooney, at Woodville, said we had a good title to it, and that we had a good title through the settlers. I did not furnish him with an abstract. I told our superintendent, Mr. Hickman, to take the matter up with Mr. Mooney, and if the matter was not all right, not to buy it. I left it to Mr. Mooney to tell Mr. Hickman whether the squatters owned the land. Mr. Mooney was retained by me as the local attorney. I did not ask the squatters to show me their chain of title, but I suppose Hickman did. I told him to pick up all the squatters' timber to be safe on, and take the matter up with Mooney, and he did. I left the matter of buying timber to my superintendent, and he required of the sellers proof of their title; they put up what claim they had to the superintendent, and he put it up to Mr. Mooney. Mr. Mooney is considered the best attorney in Tyler county, and I think he is as good as any. At the time I accepted the conveyances in evidence I believed I was getting a good title, and would not have taken them if I had not thought so, and if I had not thought so I would not have permitted the timber to be cut by my employés. The tim-

ber was all cut off after I became the receiver of the Tyler County Land & Lumber Company, and at the same time I was receiver of the J. I. Campbell Company and the Warren, Corsicana & Pacific Railroad Company, in one cause, and I was operating, under the orders of the court, the mill of the Tyler County Land & Lumber Company, and the properties of the other companies, and the nature and extent of my duties as receiver were such that I could not give my personal attention to the details of the business out about the mill, or the details of buying timber, but was required to avail myself of the services of an agent. I had then known Mr. Hickman for 10 or 12 years, and had always found him to be a careful man. I paid Mr. B. W. Wiggins for all the timber cut on the two tracts claimed by him. While operating the mill I bought a good deal of timber standing on the Mary Thomas survey, the Morales survey, the Palmer survey, what they called the Dodd survey, and a half dozen other places on the road, and on the Loving survey and other surveys. I bought some from squatters and some from other persons, being the record owners, and bought some land straight out, and have not had any litigation over any that I bought, except as to this and that on the Morales survey. On the Morales survey the controversy was over the title. Probably one-third of the timber I bought was from squatters. If I had the advice that the squatters' title was better than the record owners' title, I bought and ignored the record titles. If my attorney said the titles were all right, I said, 'Go ahead and buy it.' I didn't know anything about the titles myself, but obtained the opinion of my attorney."

C. T. Hickman testified that he was superintendent for W. H. Norris while he was receiver for the Tyler Land & Lumber Company, and operating the mill at Warren for two years, and bought the timber on the 320 acres of land from B. W. Wiggins, and from the Henry Wiggins tract, and from J. M. Mullins, and bought it under Mr. Norris' instructions. "When I bought the timber I made inquiries in regard to the claims of the respective claimants. At that time Mr. Wiggins told me that he had lived on the place, and I don't remember how many years— about twenty-five years—and remember that fact because he showed me some tax receipts which dated back a number of years, but I don't remember how many years. This statement was made at Mr. Wiggins' house, and was made at the mill, and also at Warren. I went over the land with him—I think over both tracts—and he told me that he had been in possession of both tracts, and from Mr. Wiggins' statement to me I thought, when I purchased the timber on the two tracts claimed by him, that I was getting a good title. Judge Mooney, of Woodville, looked into the matters and advised me to go ahead

and buy it. I also looked over the other tracts, and talked to the persons who sold them to me. After my conversations with the various persons from whom I had bought, we conferred with Mr. Mooney, and he sent a man down there to investigate it and see the parties in person. I think he sent his partner, Mr. Mann, down there. After Mr. Mooney had made the investigations he made a report in writing. (This report is shown to have been lost.) I showed this report to Mr. Norris. I am not sure he saw it, but I think he did. I reported to Mr. Norris all of the information I had obtained in regard to the possession and limitation of these lands. The substance of Mr. Mooney's report to me was that he thought that the titles were good. Before buying I went to the records and got an abstract to show who the record owners of the lands were. We had it abstracted, and Judge Mooney investigated the title, and advised me that it was all right. When we bought the lands we paid for them. We bought from the squatters, and I took affidavits from those from whom I bought, as to the character of their possession, in addition to talking with the persons from whom I bought. I presume there was a record title to the land in somebody else's name, but we did not investigate it any further than to have Mooney examine the title."

We understand the law to be that where one person takes property belonging to another, whether such taking be done willfully or intentionally or as the result of culpable negligence in not knowing that the property is not his own, the measure of recovery against him therefor is the value of the property at the time of demand therefor by the owner; and if the form of the property has been changed by manufacture, the measure of recovery is the value of the property in its manufactured state. If, however, the taking is not willful or intentional, but if the taker at the time of taking in good faith believes the property to be his own, and is not culpably negligent in not knowing that it belongs to another, he is liable to the owner only for its value at the time and place of taking. Louis Werner Stave Co. v. Pickering, 119 S. W. 333; Ripy v. Less, 118 S. W. 1084; Railway v. Starr, 22 Tex. Civ. App. 353, 55 S. W. 393; Railway v. Jones, 34 Tex. Civ. App. 94, 77 S. W. 955; Young v. Pine Ridge Lumber Co., 100 S. W. 784; Messer v. Walton, 42 Tex. Civ. App. 488, 92 S. W. 1037; Pettit v. Frothingham, 48 Tex. Civ. App. 105, 106 S. W. 907.

We think the evidence raised the issue of good faith of Norris in cutting the timber, and this issue was one for the determination of the trial court and not this court. Pettit v. Frothingham, supra. The assignments are overruled.

The sixth and eighth assignments are without merit, and are overruled without further comment.

The seventh is sufficiently disposed of by what we have said in disposing of the fourth and fifth assignments.

The tenth assignment complains of the action of the court in refusing plaintiffs leave to file an amended original petition. It appears that when the case was called for trial the plaintiffs announced not ready and filed a motion for continuance, which was overruled. Thereupon the defendant announced ready for trial. Plaintiffs then asked leave to file the amendment, and their request was refused. The amendment which plaintiffs sought to file, among other things, changed the description of the land they claimed to own so as to describe the southwestern quarter of the league instead of the south quarter thereof.

Article 1188, Sayles' Ann. Civ. St. 1897, provides that all amendments to pleadings when the court is in session must be filed under leave of the court before the parties announce ready for trial and not thereafter; and article 1189 provides that such leave shall be given, and such amendment filed, for a reasonable time before the case is called for trial, so as not to operate a surprise to the opposite party. The limitation as to the time within which an amendment may be made is directory. Railway v. Goldberg, 68 Tex. 685, 5 S. W. 824. It was a matter within the discretion of the trial judge as to whether he should permit the filing of the amendment in question at the time it was offered, and the exercise of that discretion can only be questioned upon appeal when it clearly appears that the discretion confided in the court has been abused, and this the record does not show. Dublin v. Railway, 49 S. W. 667; Id., 92 Tex. 540, 50 S. W. 120; White v. Bank, 27 Tex. Civ. App. 487, 65 S. W. 498; Miller v. Morris, 55 Tex. 418, 40 Am. Rep. 814; Glasscock v. Hamilton, 62 Tex. 160.

Appellee has presented several cross-assignments of error, the first challenging the first conclusion of law of the trial court to the effect that though the deed from Wiley S. Thomas and others to S. D. Thomas, through whom plaintiffs claimed title, did not convey the interest of Maria N. Roberts, Margaret Davis, or Mrs. Brownrigg in the land therein described, each of them owning an undivided one-eleventh thereof, yet as it did not appear from the evidence that they had ever asserted any claim thereto since the execution of said deed in 1842, it must be now presumed that they have in some way received their full shares or interests in said league out of the other portions thereof than the lower quarter thereof, and that therefore Jacinto Aleix and those claiming through him have acquired the title of all the heirs of Mary Thomas to said lower quarter of the league.

As before shown, the court found, and the finding is sustained by the undisputed evidence, that Mary Thomas acquired the league

in 1835, and died prior to 1842, leaving 11 children and heirs, all of whom, except three, viz., Maria Roberts, Margaret Davis, and Mrs. Brownrigg, conveyed the lower quarter to Jacinto Aleix, whose heirs are the plaintiffs in this suit; that Mrs. Roberts signed the deed, but on account of a defective acknowledgment the deed was ineffective to convey her title. There was no proof that Mrs. Davis, Mrs. Roberts and Mrs. Brownrigg had parted with their interest in said land, nor that they had or had not claimed the land since the execution of the deed by the other heirs conveying their interest to S. D. Thomas, nor that they had received their shares out of other portions of the league. In the absence of all proof the court was not warranted in presuming that said persons had so received their full interests in the league out of other portions thereof, and if the presumption could be indulged as to Mrs. Brownrigg and Mrs. Davis because they did not join in the conveyance we can see no reason for indulging the presumption against Mrs. Roberts, who signed the deed, but whose title was not thereby conveyed because of the defect noted. The assignment must be sustained.

It follows that we must also sustain appellee's third cross-assignment, which complains that the court erred in rendering judgment against him for $19/24$ instead $19/24$ of $8/11$ of the value of the timber taken from the most western of the two tracts conveyed to him by B. W. Wiggins. The ancestor of plaintiffs through whom they assert title not having acquired the $8/11$ interest of Mrs. Davis, Mrs. Roberts and Mrs. Brownrigg, were not entitled to recover the value of their interest in the timber cut by Norris.

The fifth cross-assignment complains in effect that the court erred in concluding that defendant was liable to plaintiffs for part of the value of the timber cut from the 152-acre tract described in the deed from A. D. Salter, J. C. Salter, J. G. Masterson, and W. C. Stockley, because the evidence showed that the parties named and those through whom they claimed had acquired the title to said tract under the statute of limitations of 10 years before the filing of plaintiffs' suit.

The court found in its fourteenth finding of fact that the Salters, Masterson, and Stockley sold to Norris the pine timber on the 152 acres on August 29, 1906; that for the greater part of the time for 15 years before the execution of said deed the said Salters, Masterson, and Stockley and those through whom they claimed, claiming to have a good and perfect title to said tract, had and held adverse possession of said tract, cultivating, using, and enjoying the same but that their possession was broken and the continuity of possession was not such as to entitle them to hold under the statute of limitations. We have carefully examined the evidence in the record, and are constrained to hold that the court was in error in not finding therefrom that the continuity of possession of the Salters, Masterson, and Stockley, and those under whom they claimed, was such as to entitle them to the land under the statute. The evidence shows that Henry Wiggins went on and settled upon the land in 1887, claiming it as his own, and built a dwelling house, cribs, and other houses on it during that year; that he opened a part of the tract to cultivation during said year, and continuously resided upon and cultivated a portion of the land every year up to and including the year 1899. In the latter part of 1899, or the early part of 1900, he moved off the land and rented it for the year 1900 to one Lewellyn, who took possession just after Wiggins left, and who made a crop on it and continued in possession one year. When he moved off, one Gilley rented the land from Wiggins and moved onto and made crops upon it for two years, and when he vacated he was succeeded by one Williford who made a crop on the land the year after Gilley left. This brings us to the end of 1903. In 1904 and 1905 one Kryer occupied and cultivated the land under contract with and as tenant of the Salters, Masterson and Stockley, who had at that time purchased the land from Wiggins. There was no break or want of continuity of actual possession during all of said time that Wiggins lived on the land, and none since then up to and including 1905, except such as was incident to a change of tenants; and at such times the existence of the houses, the fenced land and recent cultivation were sufficient to give to the owner notice of adverse claim. All the persons who lived upon the land after Wiggins moved off were tenants either of Wiggins or the Salters, Masterson, and Stockley. The place was never vacant for more than two months at any one time, and there has been farming on it every year from 1893, when the 152-acre tract was surveyed, up to and including the year 1905. In view of this state of facts we think the court erred in rendering judgment against Norris for the timber taken by him from the 152-acre tract in question.

The other cross-assignments presented by appellee are believed to be without merit and are overruled.

The judgment of the court below, in so far as it permits a recovery in favor of plaintiffs against defendant Norris for the timber cut off the 152-acre tract is reversed and here rendered for defendant Norris, and the judgment in favor of said Norris over against the defendants Salters, Masterson, and Stockley on the covenants contained in their deed conveying the timber on said tract to Norris is also reversed and judgment here rendered in favor of said Salters, Masterson, and Stockley; and the judgment in favor of plaintiffs for the timber cut off the most western of the two tracts purchased by Norris from B. W. Wiggins is so reformed as to

allow a recovery in plaintiffs'· favor against said Norris for $19/24$ of $8/11$ of the value of said timber, and as so reformed the judgment as to such part is affirmed.

Reversed and rendered in part.

Reformed and affirmed in part.