**' BURMARSAL CO., Inc., v. LAKE.**
**(No. 1732.)**

(Court of Civil Appeals of Texas. El Paso. April 16, 1925. Rehearing Denied May 7, 1925.)

**1. Trover and conversion ☞44—Measure of damages stated.**

Measure of damages for an innocent or inadvertent conversion is value of property at time and place of its taking, with interest from that date, unless there are special circumstances which require a different measure to be applied.

**2. Trover and conversion ☞49—Measure of damages for willful conversion of property of fluctuating value stated.**

Where conversion is willful, fraudulent, or under circumstances imputing negligence to trespasser, plaintiff, if property is of a fluctuating value, may at his option sue and recover upon basis of highest intermediate value to date of trial.

**3. Trover and conversion ☞44—Damages for conversion of oil well casing difference between price paid for other casing and sum paid by carrier in settlement of claim.**

In action for damages for conversion of oil well casing, when misdelivered by railroad to defendant, measure of plaintiff's damages was difference between price actually paid for other casing and what he had been paid by railroad in part settlement ·of his claim, especially where plaintiff, in assigning his claim to railroad, reserved only right of action against defendant for such difference.

**4. Damages ☞15—Compensatory damages to be commensurate with actual loss.**

Compensatory damages are always, to be commensurate with actual loss.

**5. Trover and conversion ☞44 — Damages market value of property where conversion was inadvertent.**

In action for damages for conversion of oil well casing, misdelivered by railroad to defendant, court erred in holding defendant liable for more than market value of casing at time of delivery, where at time defendant placed casing in its well had no actual knowledge that plaintiff was true owner thereof, but on the contrary it believed in good faith that it was true owner.

Appeal from District Court, Eastland County; Geo. L. Davenport, Judge.

Action by Alvin Lake against the Burmarsal Company, Incorporated. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Lee, Lomax & Wren, of Fort Worth, for appellant.

Etheridge, McCormick & Bromberg, of Dallas, for appellee.

Statement of Case.

HIGGINS, J. This was an action by the appellee to recover damages as the result of the alleged conversion by appellant of 2,760 feet of 6⅝-inch oil well casing, shipped by the Oil Well Supply Company, of Fort Worth, Tex., to appellee, from Hamilton, Tex., over the line of the Missouri, Kansas & Texas Railway Company of Texas (then being operated by the Director General of Railroads of the United States), and delivered to defendant at Gorman, Tex., on October 24, 1919. Plaintiff was paid by the Director General the sum of $6,900 on his claim, this payment representing the value of the casing at the time of its delivery, but in the release closing out such settlement reserved the right to prosecute against the defendant his claim for additional damages as follows: (a) The difference between the value of the casing at the time of its delivery, and the price plaintiff was compelled to pay for other casing to take its place in February, 1920. (b) For 24 days shut-down time plaintiff was compelled to pay his contracting driller, while well operations were delayed until the needed casing could be furnished.

The plaintiff sued herein to recover the difference between the value of the casing at the time of its conversion and its highest subsequent value, which difference it was alleged amounted to $2,761.50, and for the further sum of $2,400, which he was compelled to pay his drilling contractors while drilling operations were delayed until the needed casing could be obtained.

In addition to certain special exceptions and a general denial, defendant, in substance, set up: That plaintiff's casing was moved to Gorman, Tex., under a shipping permit issued to defendant, and was tendered to defendant by the Director General of Railroads as constituting and filling an order for similar casing which defendant had also theretofore placed with the Oil Well Supply Company. That, believing and having the right to believe that the shipment belonged to it, defendant placed the casing in a well for which it had been ordered near Desdemona, Tex. That, when it ascertained that the casing in fact belonged to plaintiff, defendant endeavored to withdraw it from the hole and restore it to plaintiff, but permission to pull the casing was refused by the Railroad Commission upon the ground that this would result in a "waste" of the gas then being produced from defendant's well in commercial quantities. That by reason of the premises defendant was only liable for the value of the casing at Gorman, Tex., when delivered

on October 24, 1919. That on this basis defendant had made settlement with the Director General, to whom plaintiff's claim, to this extent, had been assigned, and was not liable to plaintiff in any further sum.

There was a trial before the court, without a jury, and judgment was rendered in plaintiff's favor against defendant for the total sum of $4,056.

Findings and conclusions were filed by the trial court, in substance, as follows:

### Findings of Fact.

(1) On October 10, 1919, the Oil Well Supply Company shipped to Alvin Lake at Gorman, Tex., over the lines of certain railway companies, then being operated by the United States Railroad Administration, 2,760 feet of oil well casing theretofore purchased by Lake from the supply company for use in a well then being drilled for Lake, under a contract providing that $100 per day should be paid the drillers for any drilling delay for which the well owner was responsible. The bill of lading issued by the carriers named Lake as consignee, and in due course the bill was delivered to his manager.

(2) The casing arrived at Gorman about October 22, 1919, and was by the railroad agent delivered to Dick Gray, upon an order from Dan T. Moore, manager for appellant. Gray hauled and delivered the casing upon a lease owned by appellant, where it remained until it was placed by appellant in a nearby well owned by it. It was placed in this well some time between December 1, 1919, and January 8, 1920, upon which latter date appellant was advised the casing belonged to Lake.

(3) Moore had previously obtained from the United States Railway Administration a permit for the shipment of approximately the same amount and of the same kind of casing as that delivered to it by Gray, which had been ordered by appellant from the Oil Well Supply Company, and the Lake casing was transported to Gorman under the Burmarsal Company permit. Before Moore severed his connection with appellant, which occurred December 1, 1919, and before the casing was placed in appellant's well, Moore called at the office of the Oil Well Supply Company in Fort Worth to obtain a statement of the indebtedness of his company to the supply company, and at said time discovered that the casing shipped in under the Burmarsal permit was not charged against his company, and that such casing had not been shipped to his company, which fact was communicated by Moore to appellant's president.

(4) The casing should have reached Lake's well in ample time for use therein. Lake, through his manager, A. B. Waskom, first learned on January 8, 1920, of the arrival and delivery of his casing on October 27, 1919, to the Burmarsal Company. Waskom immediately demanded the return of the casing of E. K. Anderson, then manager of appellant,

the demand being made about 10 days before the Lake well drillers reached the depth in his well where the casing was needed, and Waskom also notified Anderson that Lake would hold appellant responsible for all shut-down time which might ensue from the detention of the casing. About January 10, 1920, Waskom called on the president of the appellant and notified him the Lake casing was in his possession; that the well for which it was intended would be ready for casing about January 18, 1920, and, if not available when needed, Lake would be damaged $100 per day for each day's delay, and would hold appellant responsible for such damage as might occur. Appellant's president thereupon told Waskom it would make every effort to give him the casing at once, but it was not delivered because of the refusal of the Railroad Commission of Texas to permit its withdrawal from the Burmarsal well.

(5) Appellant had sufficient time to furnish other satisfactory casing to Lake before he needed it for use in his well.

(6) The Lake well for want of casing was shut down about January 17, 1920, and so remained for 24 days. At the beginning of the shut-down, Lake's manager did not know the casing would not be delivered to him by appellant. After the well had been shut down about 20 days, appellant notified Lake's manager they were going to pull and deliver the casing to him.

(7) When appellant was refused permission by the Railroad Commission to pull the casing, and Lake's manager ascertained such fact, he immediately made arrangements to buy sufficient casing for use in the Lake well and did so, buying 2,800 feet at $3.10 per foot.

(8) The market value of such casing at and in the vicinity of Gorman between October 24, 1919, and February 10, 1919, upon which latter date Lake's manager obtained other casing, ranged from $2.60 to $3.50 per foot. The market value of Lake's casing at the time of its delivery to appellant on October 27, 1919, was $2.50 per foot. The market value of the casing bought by Lake to replace his casing used in the appellant's well at the time of its purchase was $3.10 per foot. Of the 2,800 feet so purchased by Lake, 2,760 were to replace the casing which had been used in the appellant's well.

Since the completion of his well, Lake has been compelled to pay his drilling contractors $2,400 damages for the 24 days delay in drilling caused by the detention of the Lake casing by appellant.

Lake made a settlement with the United States Railway Administration of his claim for damages, receiving the sum of $6,900, the market value of his casing at the time it was delivered to appellant. In this settlement with the Railroad Administration, Lake reserved his claim for the increased value of

the casing between October 24, 1919, and February 10, 1920, and his claim for recovery against appellant of the $2,400 so paid to his drilling contractors.

While appellant, at the time of the delivery to it of the Lake casing, accepted it in the belief that such casing belonged to it, and while appellant, upon learning, on or about January 10, 1920, that the casing was in fact Lake's property, would have thereafter delivered same to Lake but for the refusal of the Railroad Commission to permit its withdrawal from the well, appellant, nevertheless, before said casing was placed in its well, ascertained that the casing delivered to it under its permit number was not in fact its property; it was grossly negligent in thereafter using the casing in its well, thus placing same beyond its power to return to its true owner. That the special damage brought to its notice by Lake could have been avoided by appellant by the delivery to Lake of other casing prior to the time the Lake well was compelled to shut down for want of the casing.

### Conclusions of Law.

Lake was the owner and entitled to the possession of the casing; that same was wrongfully appropriated by appellant to its own use; that appellant was grossly negligent in placing the casing in its well after discovery that same did not belong to it; that Lake is entitled to recover of appellant $2,-400 paid to the drilling contractors, as above shown, also the market value at Gorman of the 2,760 feet of casing which he had been compelled to buy at $3.10 per foot, less the sum so paid him by the United States Railroad Administration, the balance upon this latter item amounting to $1,656, making a total recovery to which the plaintiff was entitled of $4,056.

### Opinion.

[1, 2] The measure of damages in conversion is the value of the property at the time and place of its taking, with interest from that date, unless there are special circumstances which require a different measure to be applied. Craddock v. Goodwin, 54 Tex. 578. The measure indicated is the proper rule in the case of an innocent or inadvertent conversion. Grimes v. Watkins, 59 Tex. 133; Masterson v. Goodlett, 46 Tex. 402; Early-Foster Co. v. Mid-Texas Oil Mills (Tex. Civ. App.) 208 S. W. 226; Miller v. Winfree (Tex. App.) 15 S. W. 918; Bayle v. Norris (Tex. Civ. App.) 134 S. W. 767; Pettit v. Frothingham, 48 Tex. Civ. App. 105, 106 S. W. 907; Railway Co. v. Jones, 34 Tex. Civ. App. 94, 77 S. W. 955. But where the trespass is willful, fraudulent, or under circumstances imputing negligence to the trespasser, thus showing he is indifferent to the rights of others, the plaintiff is not restricted to that measure. Under such circumstances, and in the case of property of a fluctuating value, the plaintiff at his option, may sue for and recover upon the basis of the highest intermediate value to the date of the trial. Early-Foster Co. v. Mid-Tex. Oil Mills, supra, and cases there cited. So also in the case of timber unlawfully cut and made into ties under the circumstances last indicated the plaintiff may recover the value of the finished product. Emporia Lbr. Co. v. League (Tex. Civ. App.) 105 S. W. 1167; Young v. Pine Ridge Lbr. Co. (Tex. Civ. App.) 100 S. W. 784; and some of the other cases cited above.

[3, 4] The plaintiff herein sought to recover the highest intermediate value and the additional item of $2,400 special damage. If it be conceded that the circumstances authorized the application of a different measure than the value of the casing at the time of its conversion, nevertheless as to the first item the court properly limited it to the difference between such value and the price actually paid for other casing to take its place, because the casing was bought for a special purpose, and appellee obtained other casing to take its place at less than the highest intermediate value. Under such circumstances the court properly limited his recovery as to this item to the difference between the price which he paid for the other casing and what he had theretofore been paid by the Railroad Administration in part settlement of his claim. Compensatory damages are always to be commensurate with the actual loss, neither more nor less; and, since the plaintiff obtained other casing at $3.10 per foot to take the place of that converted, his actual damage upon this item was properly computed upon the basis of the price thus actually paid. Furthermore, in his settlement with the Railroad Administration, which was made upon the basis of the value of the casing at the time of its delivery to appellant, the plaintiff reserved from the operation of the assignment that portion only of his claim against appellant "for special damages based upon the delay in his drilling operations in the sum of $2,400, plus interest, and for the additional cost of pipe over the sum of $6,-900 that he was compelled to pay in order to procure other casing for the completion of his said well; it being understood that said portion of his claim against Burmarsal Company, Incorporated, is expressly reserved by him, and may be prosecuted by him against said Burmarsal Company, Incorporated."

[5] The trial court, in holding the appellant liable for more than the market value of the casing at the time it was delivered to appellant, based its ruling upon the finding that at the time the casing was placed in its well the appellant knew that in fact the same was not its property, and with this knowledge it was grossly negligent in thus using the same. If the finding of fact upon which this ruling is based be correct, we agree with the view that under the circumstances the appellant

displayed a conscious indifference to the rights of others and of the consequences of its action, and was thus grossly negligent, but we think the record does not support the finding that at the time the appellant used the casing it in fact knew the same was not its property.

At and prior to the time of the shipment of the casing, due to traffic conditions prevailing in the oil regions of that section, the Director General of Railroads was enforcing a partial embargo upon the transportation of certain classes of freight, casing being embraced within such embargo.

Plaintiff's witness, Dan T. Moore, by deposition, testified:

Direct examination:

"(2) In the month of October, 1919, I was employed as managing director by the Burmarsal Company, Incorporated. My connection with that company commenced on or about May 15, 1919, and terminated on December 1, 1919.

"(3) Some time in October the Burmarsal Company, Incorporated, received a shipment of 6⅝-inch casing at Gorman, Tex. The record of this shipment can be obtained from the station agent at Gorman, Tex. The casing which the Burmarsal Company, Incorporated, received, was receipted for by Dick Gray and brought out to the lease by him. Before I could get authority to have this casing shipped to Gorman, an order to Mr. Gray, directing him to bring this casing out to the lease immediately, had to be given to the station agent at Gorman to that effect, directing Gray to bring this casing out to the lease immediately after its arrival at Gorman.

"(4) This casing upon arrival was piled on the Burmarsal lease where it remained until it was placed in the well after I severed my connection with the company.

"(5). Of my own knowledge, I do not know where this pipe is located at this time.

"(6) I do not remember receiving any communication regarding this pipe until after I had severed my connection with the company.

"(7) When I was severing my connection with the Burmarsal Company, I went to the Oil Well Supply Company to get a statement from them showing the amount due them by the company. This statement did not include any casing. I asked them why the casing had been omitted and they told me that their records did not show that any had been shipped to us. I told them that I had received a carload and that it was on our lease, and that they had better look the matter up."

"(11) As stated above, when I called on the Oil Well Supply Company, at Fort Worth offices, to obtain a statement as to the amount owed them by the Burmarsal Company, Incorporated, the casing had been shipped in under a permit which I obtained, was not on our statement, and they told me that their records did not show that it had been shipped to us. Under the business conditions which prevailed at that time, I was not very much surprised, but thought perhaps there had been a mistake in their records and told them to look it up, and reported the matter to Mr. Burke, the president of the Burmarsal Company, Incorporated. * * *"

Cross-examination:

"(1) The Burmarsal Company, Incorporated, had placed an order with the Oil Well Supply Company prior to October 27th for approximately the same amount of 6-inch casing as that received by it from Mr. Dick Gray. To get the permit to be able to ship the casing ordered by rail to Gorman, I had to make two trips to Dallas. When I started to get this permit, they were only issued by some official in the Missouri, Kansas & Texas Railroad Company's offices in Dallas; before I got to Dallas the method had been changed, and the agent at Gorman had been authorized to issue these permits. Before I could get back to Gorman, the agent's authority to issue the permits had been canceled, and the authority had been again vested in the official in the offices of the Missouri, Kansas & Texas Railway Company of Texas, at Dallas, so I returned to Dallas and found it had again been changed back to Gorman. Upon my return to Gorman, I obtained the permit from the agent at Gorman, but, in order to obtain the permit, I had to sign an order giving him the authority to have Dick Gray transport this casing to the Burmarsal lease immediately upon its arrival at Gorman. Yes; the casing was received at Gorman under the permit which I had obtained for the shipment of the Burmarsal casing. The first time I saw the casing was when about 8 wagon loads of it arrived at one time, on the lease, brought there by Dick Gray's teams, and I told them to unload it near the well. There was no doubt in my mind at the time this casing was received that it constituted the shipment which I had ordered from the Oil Well Supply Company for the Burmarsal Company, Incorporated."

Frank G. Burke, Jr., appellant's president, by deposition, testified:

"(2) To the best of my knowledge and ability the Burmarsal Company received, on or about October 27th, the carload of casing described herein, with the exception that on the waybill was printed the name of the Burmarsal Company and their permit number.

"(3) I think I wrote Mr. Lake the letter described in question No. 3, being dated January 11, 1920, that our company had received delivery of the shipment over a month before that date, and had already set the same in the well."

"(13) We were always willing to deliver this casing to Alvin Lake, and the reason that we were unable to deliver the casing was due to the fact that the Railroad Commission of Texas had forbid us to open this well up.

"(14) It is a fact that the Burmarsal Company, Incorporated, settled a claim made against it by the Missouri, Kansas & Texas Railway Company of Texas for the market value, as of the date of delivery to Burmarsal Company, Incorporated, of the Alvin Lake casing, described in interrogatory 2; this settlement was made in New York City, in 1922."

Cross-examination:

"(1) I was not at Gorman, Texas, when the car of 6⅝ casing arrived, and the information that I have in regard to the carload of casing was obtained through our records and from information given by our representatives subsequent to January 10, 1920.

"(2) My answer to this interrogatory is fully answered by my answer to direct interrogatory No. 2, except to state that the agent at Gorman made it very explicit that this was our casing and that it must be removed at once. Yes; it was my information that the casing inquired about was shipped on the Burmarsal Company's permit, and that the agent of the Railroad Administration at Gorman did insist that the payment in question was intended for the Burmarsal Company, and that such company should accept delivery of the casing."

"(6) The only thing that prevented us from being able to deliver the casing was the fact that the Railroad Commission of Texas had absolutely refused us permission to open up this well to enable us to draw the casing therefrom.

"(7) As stated, I have made a settlement with the Railroad Administration, and the settlement was made on the basis of my offer to Alvin-Lake, as contained in my letter of January 30, 1920, that is, at the price at which the Oil Well Supply Company had accepted the Burmarsal Company's original order for this casing."

In another set of depositions Burke testified:

"(3) About December 1, 1919, at the time Mr. Moore resigned from the Burmarsal Company, we called on him to get in all bills that he knew of, so that we could find out the total amount of our indebtedness in Texas at that particular time. I am not sure whether Col. Moore spoke about this casing at that time; however, we had knowledge that a car of 6-inch casing had been received at Gorman the latter part of October on which we paid freight charges under our permit number, also the drayage thereon, and we did not have any knowledge or any thought that this casing was other than our casing. At that particular time in Texas it was practically impossible to ever find out anything about any shipments that were being made, and when this car of casing arrived without permit number, and our Mr. Anderson was notified by the station agent to immediately withdraw this casing, we did not question but what it was our casing, and the only thing that Col. Moore could have said about it was that, when the car of casing was received from the Oil Well Supply Company, he had received no bill.

"(4) The first information that I had that this car of casing might belong to other people was when Mr. Waskom, representing the Alvin Lake Company, called on me at the Westbrook Hotel in Fort Worth, on or about January 10, 1920. About the same time I received a telegram from our representative, Mr. Anderson, that he had been called on by Mr. Waskom in regard to this casing, and Mr. Waskom, at that time, stated, that to the best of his knowledge and belief the car of casing we received on or about October 27th belonged to the Alvin Lake Company. But at the time he spoke to us this casing had been placed in our well for some time.

"(5) I would not at this time attempt to specify the exact date on which this casing was placed in our well, but I believe it was placed in the well some time during the month of November, 1919, or the very early part of December, as I know I was in Desdemona,

Tex., during the early part of December, 1919, and no question at that time had ever been brought up in regard to the ownership of the 6-inch casing that was in the well, for we had ordered a car of casing from the Oil Well Supply Company, and, when it came in from the Missouri, Kansas & Texas Railroad with our permit number on it, there did not seem to be any reason why we should raise any question of a doubt as to the ownership of the casing. We had no reason to believe that this was not our casing, for about that time I called on Col. Moore for a statement of our liabilities in Texas, and he told me he had been to the Oil Well Supply Company and asked them for a statement of their account, and on their statement there was no charge for casing, and he said he was not very much surprised, that they did not know what they were doing down there, and had probably made a mistake in their records, but eventually we would get a bill for this casing. At the time Mr. Waskom called on me in Fort Worth, and we were finally shown that this was not our casing, and that it belonged to the Alvin Lake Company, we told him that we would use every effort to give him the casing at once, as it was of no particular benefit to our well, for we had struck a heavy gas pressure and the casing was really serving no useful purpose. We then found that we would have to get permission from the Railroad Commission of Texas to open up this well, and we applied for permission to do so and withdraw this casing, but it was refused by the Railroad Commission on account of being dangerous to the surrounding property to open the well, which concluded the possibility of our delivering this casing at this time to the Alvin Lake Company. In regard to this question, I can only state that at all times in this matter we have acted in the best of faith, and, when we placed the casing, it was done with the absolute belief that it was our casing, and, when we found that there was a question of it not being our casing, we tried in every way in our power to endeavor to give this casing to the Alvin Lake Company, but we were prohibited from so doing by the Railroad Commission, which took the matter completely out of our hands, and in our subsequent negotiations with the Alvin Lake Company we have tried to do the fair thing to the best of our ability."

A. B. Waskom, appellee's manager, testified:

"I never received this casing. My first knowledge was received by way of a telegram from T. G. Gray, our teaming contractor, at Gorman, Tex., January 8, 1920. Car arrived October 27, 1919, unloaded by Burmarsal Oil Company, and hauled to their lease north of Desdemona, After investigation, the above facts were also confirmed by the railroad agent at Gorman, Tex."

The foregoing is all of the evidence bearing upon the issue of appellant's good faith in placing the casing in its well. It wholly fails to show that at that time it had any actual knowledge it was not the true owner of the casing. But, if the facts were sufficient to put it upon notice that it was not its casing, or sufficient to raise a reasonable doubt of its right thereto, then it cannot be re-

garded as an innocent trespasser. Certainly the facts were not sufficient to affect it with notice as a matter of law, nor in our opinion do they in any wise impugn its good faith. It was not until about January 8, 1920, that appellant learned that the casing did not belong to them. They had placed it in the well between December 1, 1919, and that date. At the time appellant placed it in the well it had been in their possession for at least a month without anything to cast a suspicion upon its right thereto, unless it be the fact that about December 1, 1919, its manager, Moore, then preparing to quit its service, had ascertained that the records of the Oil Well Supply Company at Forth Worth did not show a shipment to his company of this casing, and the statement of his company's indebtedness to the supply company did not include any casing. But Moore testified, and there is nothing to cast any suspicion upon it, that under the business conditions prevailing at that time he was not surprised, thought there was a mistake in their records, told the Supply Company to look the matter up, and reported it to the president of his company. Moore, under the circumstances, was wholly justified in the mistake he made in assuming that the error was in the records of the supply company. His company had ordered from the supply company similar casing, it was shipped to Gorman under the permit he had theretofore obtained after much trouble; when it arrived at Gorman, the railroad had insisted upon its acceptance by appellant as its casing, and at the time Moore called upon the supply company the casing had been upon his company's lease about 30 days, and nobody had asserted an adverse claim.

Under the circumstances, we are of the opinion there is no evidence to impugn the good faith of the appellant when it placed the casing in its well, and therefore the proper measure of damage is that applying in the case of an innocent or inadvertent conversion. Callen v. Collins, 56 Tex. Civ. App. 620, 120 S. W. 546. If this be the correct measure, the appellee has no right of action, it having received payment upon that basis from the Railroad Administration, and assigned the right of recovery therefor to such Administration.

For the reason indicated, those assignments are sustained which complain of the finding of the trial court that at the time appellant placed the casing in its well it had ascertained the same was not in fact its property, and was grossly negligent in thereafter using the same. All other assignments are regarded as without merit and are overruled.

The case appears to have been fully developed. The judgment will be reversed, and here rendered in appellant's favor.

Reversed and rendered.