### HALSEY et al. v. HUMBLE OIL & REFINING CO. et al.

### No. 2123.

Court of Civil Appeals of Texas. Beaumont. Dec. 14, 1933.

Rehearing Denied Dec. 20, 1933.

J. A. Wisong, of Beaumont, Llewellyn & Dougherty, of Liberty, and Chas. T. Butler, of Beaumont, for appellants.

E. B. Pickett, Jr., of Liberty, and B. H. Powell, of Austin, for appellees.

O'QUINN, Justice.

This is a suit in trespass to try title brought by John B. Halsey and others on December 5, 1927, against Mrs. L. E. Applegate, Clay Breeden, Sanford T. Breeden, Olive Brown, appellees, and others, to recover a tract of land alleged to contain 640 acres, more or less, a portion of the B. M. Spinks league in Liberty county, Tex., and alleged to be situated in the northwest corner of the south half of said Spinks league.

On January 5, 1928, and February 17, 1930, plaintiffs filed their first and second amended original petitions. These for the purpose of making additional parties defendant.

All defendants, except Mrs. L. E. Applegate, Clay Breeden, Sanford T. Breeden, and Olive Brown, were disposed of by dismissal of some of them from the suit, and by settlements made with others.

Defendants Mrs. L. E. Applegate, Clay Breeden, Sanford T. Breeden and Olive Brown answered by general demurrer, general denial, plea of not guilty, and specially pleaded in defense the three, five, ten and twenty-five year statutes of limitation (Rev. St. 1925, arts. 5507, 5509, 5510, 5519).

A portion of the land sued for by appellants was decreed to them, the appellees not claiming that portion, but that portion of the land sued for which this appeal affects was adjudged to appellees under their plea of ten-year limitation title. Both parties filed motions for instructed verdict which were refused.

The case was submitted to a jury upon the one special issue of ten-year limitation, which was answered in favor of the appellees, and judgment was entered in their favor. Motion for a new trial was overruled and the case is before us on appeal.

Appellants' first nine assignments of error, in different ways, assert that the verdict of the jury in answer to special issue No. 1 finding in favor of appellees on their plea of ten-year limitation was without sufficient support in the evidence, and so against the weight and preponderance of the evidence as to be manifestly wrong, by reason of which the judgment should be reversed and here rendered for appellants, or, if not, then that the judgment should be reversed and remanded for another trial. These nine assignments are submitted together.

Appellees, in their first counterproposition to appellants' above assignments, say that appellants presented to the court a special charge relating to special issue No. 1, explaining and enlarging the definition of "peaceable and adverse possession" as contained in said special issue, which special charge requested by appellants was given by the court to the jury, and that in requesting the special charge appellants conceded that

1084

the evidence raised the issue of ten-year limitation, and therefore cannot now be heard to question the sufficiency of the evidence to raise the issue. This contention must be overruled. Whatever may have been the rule as to situations such as here shown, the amendment to article 2190, R. S., by the 42d Legislature (Gen. Laws 42d Leg. Reg. Sess., c. 78, p. 120 [Vernon's Ann. Civ. St. art. 2190]) permits "a claim that the evidence was insufficient to warrant the submission of any issue may be complained of for the first time after verdict, regardless of whether the submission of such issue was requested by the complaining party." Stark v. R. B. George Machinery Co. (Tex. Civ. App.) 41 S.W.(2d) 1023. The authorities cited by appellants to sustain their insistence applied to the rule of practice before the amendment to article 2190 above noted.

Appellees' second counterproposition to appellants' first nine assignments insists that the evidence not only authorized but required the court to submit to the jury the question of whether or not appellees had title under the ten-year statute of limitation to that part of the land to which the charge applied, and that the finding of the jury in favor of appellees is abundantly sustained by the evidence.

As above stated, the case was submitted to the jury upon one special issue. It reads: "Have the defendants, Mrs. L. E. Applegate, Clay Breeden, S. T. Breeden and Olive Brown, and those under whom they hold, either themselves or through a tenant, had peaceable and adverse possession of a substantial part of that portion of the tract of land sued for by plaintiffs herein, which lies south of the south line of the upper 229 acre tract as conveyed by Sadie L. McManus to W. D. Wilcox on March 21st., 1907, using and enjoying the same continuously for as long as ten years prior to the filing of this suit? Answer Yes or No."

Relative to this issue, the court further charged the jury:

"And to guide and govern you in answering Question No. 1 hereinafter propounded to you, I give you the following instructions: I charge you that the term 'peaceable possession,' as used in said question, is such possession as is continuous and uninterrupted by adverse suit to recover the land referred to in said question. The term 'adverse possession,' as used in said question, means an actual and visible appropriation of the said land, commenced and continued under a claim of right inconsistent with and hostile to the plaintiffs herein and those under whom they hold. But further I charge you that the term 'continuous and uninterrupted,' does not in law mean that the possession cannot cease for any period of time, and I charge you that if you find from the evidence that during certain periods there was gaps or breaks in

the fence, if any, which may have inclosed a substantial portion of said land, then if you further find that such gaps or breaks were only temporary and were repaired in a reasonable length of time under all the surrounding facts and circumstances, then, if you so find, I charge you that such temporary gaps or breaks in the fence would not prevent the use and enjoyment which said defendants and those under whom they hold made of the land either themselves or through a tenant, from being regarded as continuous and uninterrupted, or from being regarded as an actual and physical appropriation of the land. And still further I charge you in connection with the question hereinafter propounded to you, that if you find from the evidence that there were periods of time during which said defendants, and those under whom they hold or their tenant, were prevented from pasturing cattle upon the land they had inclosed, if any, by overflows from the Trinity River, which also, at times, hid from view the fences on said land, and if you further find that such periods of time were not unreasonable under all the surrounding facts and circumstances, then I charge you that the fact that such overflows at times prevented the pasturing of cattle upon said land, and also hid from view the fences thereon, would not prevent the use and enjoyment which said defendants and those under whom they hold, and their tenant, made of the land, from being regarded as continuous and uninterrupted, or from being regarded as an actual and visible appropriation of the land.

"And also I charge you that the burden of proof is upon the said defendants to establish an affirmative answer to the question hereinafter propounded to you, and by the expression 'burden of proof,' is meant the greater weight of credible testimony."

At the request of appellants, the court gave to the jury two special charges bearing upon and in explanation of said issue, to wit:

"(a) Gentlemen of the Jury: In this case the testimony shows that the defendants, in order to show an inclosure of a substantial portion of the land in controversy, are relying upon a fence for a portion of said inclosure, and upon a bayou as a natural barrier for the remainder of such inclosure, along the east line of such inclosure claimed by them. You are instructed that a natural object, such as a stream or bayou, may be used as a barrier instead of a fence, if the character of such bayou or stream is reasonably sufficient to prevent the cattle of defendants from escaping from the claimed inclosure, and the cattle of other persons from entering such inclosure, through or across such stream or bayou; but, where a stream or bayou is used as a natural barrier in connection with a fence, which is an artificial barrier, for the purpose of constitut-

Ing an inclosure, such natural and artificial barriers must be so used as to distinctly show that, jointly, they are relied upon to constitute an inclosure, and that the character of such joint use must be sufficient to notify the true owner and the public that the land is adversely appropriated. And in determining whether said barriers so jointly used are sufficient to notify the true owner and the public that the land is adversely appropriated, the quantity, character and location of the land must be taken into consideration to determine whether such appropriation constitutes a notorious indication of ownership.

"You are further instructed that in order for a bayou or stream to constitute a natural barrier, its character must be such that, under ordinary conditions, cattle would not cross at such places where it is relied on as a barrier; but it cannot be considered as a sufficient barrier taking the place of a substantial fence, if cattle may cross same at will under ordinary conditions."

"(b) Gentlemen of the Jury: For your guidance in answering Question No. 1 in the court's charge, you are instructed that by the term 'peaceable and adverse possession,' is meant such possession as is actual, continuous, visible, notorious, distinct, exclusive and hostile. It must be such possession as is open and of such a character as would indicate clearly to the owner of the land that the occupant was claiming the same. The improvements on the land must be of such a nature as would reasonably apprise the true owners that the said parties were claiming the land adversely to them.

"To constitute peaceable and adverse possession as applicable to the facts in this case, the land, or a portion thereof, must have been used as a pasture, the fences reasonably maintained so as, under the circumstances, to actually inclose the same or part thereof for such pasture. Such inclosure must constitute a visible appropriation of the land sufficient to apprise the true owner thereof and all other persons that it was being adversely claimed. The inclosure mentioned above must be of a substantial nature so as to reasonably exclude the cattle of other persons and to prevent cattle of claimant escaping therefrom, and maintained during the whole consecutive period of ten (10) years hereinabove referred to, and the use of the land as such pasture must have continued during said consecutive period of ten (10) years. The use and inclosure must be concurrent in point of time."

As guided by all these charges, in considering the evidence, the jury answered the issue "Yes."

The B. M. Spinks league is joined on the north by the T. D. Yoakum league, and on the south by the R. O. W. McManus league. They are all bounded on the west by the Trinity river. The Spinks league was divided into north and south halves by a deed from B. M. Spinks to Josiah Martin, administrator of the estate of James Martin, deceased, dated September 7, 1838, whereby the south half of said league was conveyed to said Martin. The 640-acre tract sued for by appellants is a part of the south half, alleged to be situated in the northwest corner of said half. The trial court held that appellants acquired the record title to the 640 acres sued for by them under a regular chain of conveyances from Martin. The north line of said 640-acre tract is a common line with the middle line of the Spinks league that divides it into north and south halves, while the south line of said tract, located about 450 varas north of the south line of the Spinks league, is a common line with the north line of a tract of land out of the Spinks league known as the Oliver or Cummings tract, and also known as the Wilcox lower 229-acre tract.

R. O. W. McManus, who owned the McManus tract south of the Spinks, and also land in the southwest part of the Yoakum league, and the western part of the north half of the Spinks league adjoining on the north the tract of land in controversy, prior to his death in 1885, claimed a tract of 640 acres of land in the northwest part of the south half of the Spinks league, which 640 acres embraced most, if not all, of the 640 acres sued for by appellants. The claim of McManus to this 640 acres had its inception in a tax deed executed to him in 1878, one of the tracts so conveyed being described as "640 acres of land out of the northwest corner of the lower half of the B. M. Spinks League." Whatever claim of right or interest McManus had in this 640-acre tract of land, after his death, passed to his five children, R. C., Sarah J., Catherine B. (the wife of A. G. McCormick), W. P. T., and V. R. These five children, on February 28, 1900, executed to Hugh Jackson a power of attorney, designating themselves as the sole heirs at law of R. O. W. McManus, and authorized said Jackson to "take possession of, sue for, if necessary, and secure a record title to, in our names establish boundary lines upon the ground to all that certain tract of land situated in Liberty County, Texas, * * * and being 640 acres of land out of the west end of the B. M. Spinks League, * * * and do and perform every act and thing necessary or proper to be done in the establishment of the said 640 acres upon the ground." By this power of attorney an undivided one-fourth of said land was conveyed to said Jackson. On July 31, 1901, Hugh Jackson by deed conveyed to W. D. Wilcox "an undivided one-fourth part and portion" of a tract of land in the Spinks league, describing the tract by metes and bounds, and reciting that it contained "in all about 366 acres of land." This deed was placed of rec-

ord August 8, 1901. This same tract of land, delineated upon what is called the larger Partlow map in the records, as the "O. M. Breeden Est.," and computed to contain 413.-08 acres and is the land in contest. By deed of date August 31, 1901, R. C. McManus, Sarah J. McManus, and C. B. (McManus) McCormick conveyed to W. D. Wilcox their undivided interests in said tract of land, which described the tract by metes and bounds. This deed was placed of record September 13, 1901. By deed of date September 12, 1901, W. P. T. McManus conveyed to W. D. Wilcox all of said tract of land describing it by metes and bounds. This deed was filed for record September 13, 1901. By deed of date January 22, 1903, filed for record February 4, 1903, V. R. McManus conveyed to W. D. Wilcox his undivided interest in this same tract of land, describing the whole tract by metes and bounds. These conveyances put the entire McManus right in or claim to the 640-acre tract in W. D. Wilcox. The description of the 640-acre tract in the deed from V. R. McManus, Hugh Jackson, and W. P. T. McManus to Wilcox made reference to an adjoining survey known as the Oliver tract, a portion of which said Oliver tract Wilcox purchased from C. R. Cummings & Co. by deed of date September 27, 1901, filed for record December 21, 1901. The land in this conveyance was 229 acres and is designated herein as the Wilcox lower 229 acres, or the lower 229 acres. This land was also described by metes and bounds.

Before Wilcox purchased the land in the Spinks league described by the several deeds mentioned above, he had become the owner, jointly with one R. D. White, of the entire R. O. W. McManus survey which adjoins the Spinks league on the south. Wilcox also purchased from Sadie L. McManus, widow of R. O. W. McManus, by deed of date March 16, 1907, filed for record March 21, 1907, the tract referred to as the upper 229 acres, a portion of the Spinks league and shown on the map as the "O. M. Breeden Est. 229 acres."

W. D. Wilcox died in 1908, and thereafter the several tracts of land in the Spinks league which had been conveyed to him, that is the upper 229-acre tract, the 413.08-acre tract (sometimes called the 366 acres, and also designated as about 366 acres), the lower 229-acre tract, and the undivided one-half interest in the McManus survey were conveyed by his executors, S. R. Wilcox, W. E. Wilcox, and George L. Wilcox, joined by his widow, Catherine Wilcox, to L. G. White by deed of date January 8, 1918, filed for record February 27, 1918. In this conveyance each of the tracts was described by the same metes and bounds as in the deeds to W. D. Wilcox. On April 19, 1918, by deed filed for record October 8, 1918, the same tracts of land, by the same descriptions, were conveyed by L. G.

White to A. C. Breeden, who, by deed of date October 21, 1921, filed for record February 20, 1922, conveyed all of said tracts, describing them by the same descriptions, to O. M. Breeden. O. M. Breeden died in June, 1926, leaving only collateral kindred as his heirs, appellees being some of them, all of them were joined as defendants, but the others adjusted their interests, as shown by the judgment, and are not concerned with this appeal.

We have, at the risk of being tedious, rather fully set out facts, which we think sufficient to show the origin and extent of appellees' claim to the land in litigation.

Most, if not all, of the land purchased by Wilcox and the Breedens had been used by the prior owners for pasture purposes. All of the different tracts had been and were inclosed at least from the year 1901 for that purpose. The Trinity river bounded the lands on the west, and was the barrier on that side. Its effectiveness for that purpose is not questioned. The tract in controversy, 413.08 acres, designated as the O. M. Breeden estate tract, was included within the inclosure as part of the Wilcox, and later Breeden pasture, was inclosed by the Trinity river, Mack's bayou, and wire fences. We do not think that appellants dispute the fact of the barriers—river, bayou, and wire fences—inclosing the land, but that they insist that the barriers, that is the wire fences and Mack's bayou, were not such as to render the possession exclusive—would not and did not prevent the stock inside from passing out, or outside stock of other owners from passing in. This contention is based upon the grounds:

(a) That the land is situated in the Trinity river bottom, is low, swampy, and subject to overflow; that periodically the river would overflow and cover the land for a considerable depth, rising above and completely hiding the fences, and remain so for from a few days to weeks at a time; that when such floods occurred the stock would have to be removed from the inclosure and driven to a higher ground for safety, and thus, at such times, the possession and use of the land were broken—that at such times, if the owner, appellants, had visited the land there would not have been anything visible to have put them on notice that the land was being claimed and used by another; that in fact during the times when the land was covered with water appellees were neither in possession of nor using the land, and so the open, notorious, exclusive possession and continued use of the land did not exist to support limitation in favor of appellees.

This contention is overruled. While it is true that the adverse possession and use of land that will ripen title by limitation must be open, visible, exclusive, and continuous for the period required by law, still it is well

settled that a temporary break of a few days or a few weeks at a time in the actual occupancy or use is not unreasonable, nor does it break the continuity of the possession and use of the property so as to defeat the limitation claim. The good faith of appellees' claim to the land is not questioned, nor could it be. The claim originated in deeds duly executed and placed of record, and the title or claim thus began passed to appellees by mesne conveyances describing the land by metes and bounds and all promptly placed of record. Before Wilcox acquired the land in controversy, in 1901, it was inclosed and in use as a pasture by his vendors. After purchasing same, he continued to use it as such repairing the fences already in existence. In 1907, Wilcox purchased the "229 upper acre tract," which joined the 640-acre tract on the north, from Mrs. McManus. She had been using this tract as a pasture, and immediately after purchasing same, Wilcox repaired the fence, inclosing the 229 acres, from the head of Mack's bayou running north and west to the Trinity river inclosing, with his lower land, the 229 acres. The south line of fence of the 229 acres, which was also the north line of the 640 acres, was then permitted to go down because the 229-acre tract was then in the pasture with his other land, the whole inclosing the 640-acre tract.

The periods of overflow, when the Trinity river would be at flood stage at Liberty, Tex., were shown by appellants, as reflected by the weather bureau kept at Houston, Tex., showing such periods from 1902 to 1930, inclusive. They were: 1902, December 19 days; 1905, May 22 days, June 23 days; 1906, January 2 days; 1907, May 2 days, June 24 days; 1908, February 12 days, April 4 days, May 31 days, June 30 days, July 6 days; 1913, December 21 days; 1914, January 9 days, May 26 days, June 9 days; 1915, April 1 day, May 29 days, August 6 days; 1916, February 2 days, April 8 days, May 24 days, June 2 days; 1918, December 9 days; 1919, January 6 days, February 3 days, July 7 days, October 10 days, November 30 days, December 6 days; 1920, January 15 days, February 17 days, May 2 days, June 16 days; 1921, April 18 days, May 4 days, June 2 days; 1922, March 5 days, April 30 days, May 31 days, June 7 days; 1923, February 3 days, March 2 days, April 14 days, May 1 day; December 10 days; 1924, January 13 days, February 2 days, March 28 days, April 5 days, May 6 days, June 9 days; 1925, November 12 days; 1926, March 6 days, April 18 days, May 12 days, December 4 days; 1927, May 16 days, April 19 days, May 12 days; 1929, May 16 days, June 22 days; 1930, February 1 day, May 13 days, June 5 days.

In the years not mentioned above, there were no flood periods. It thus appears that during a period of twenty-nine years, the longest periods of continuous floods covering the land in question were 45 days in 1905 and 73 days in 1922. These lapses, when appellees and those under whom they hold, by reason of the flood periods were compelled to remove their cattle from the pasture, were temporary and not sufficient to break and destroy their possession and use of the land so as to defeat their claim of limitation. During all these times appellees and those in possession of the land asserted their adverse claim to the land, and as soon as possible, after the flood waters subsided, placed their stock back in the pasture and continued at all times to hold and use same as before. Their use of the land was fully such as the nature of the land and the effect upon it of natural forces and elements permitted. Their efforts to use and exclude others from it did not cease, but were such as comported with the usual use and management of similar lands by their owners. Village Mills Co. v. Houston Oil Co. (Tex. Civ. App.) 186 S. W. 785, 799; Billingsley v. Houston Oil Co. (Tex. Civ. App.) 182 S. W. 373, 374; Gunter v. Meade, 78 Tex. 634, 14 S. W. 562; Collins v. Megason (Tex. Civ. App.) 228 S. W. 583, 585; Dunn v. Taylor (Tex. Civ. App.) 107 S. W. 952, 956; Morrison v. Bennette (Tex. Civ. App.) 228 S. W. 307; Whitehead v. Foley, 28 Tex. 1, 15; Bayle v. Norris (Tex. Civ. App.) 134 S. W. 767, 774 (writ refused); Beasley v. Howell, 117 Ala. 499, 22 So. 989; Robinson v. Nordman, 75 Ark. 593, 88 S. W. 592; Burns v. Curran, 282 Ill. 476, 118 N. E. 750. The very same rule that applies to gaps and breaks that at times may exist in fences forming an inclosure, and to water barriers that at times become dry, applies with equal force, as does the reasoning upon which the rule is based, to temporary cessation in the use and occupancy of a tract of land on account of floods upon the land, such as occasionally overflowed the land here in controversy. At no time did appellees, or those under whom they hold, voluntarily cease to use the land. The cessation of its use during flood periods was caused by the act of God. Likewise, the breaks in the fences occasioned by the floods. Appellees repaired the fences and resumed the use of the land as soon as conditions permitted. In such circumstances the exclusiveness of the possession was sufficient. One cannot exclude the acts of God—the law does not require impossibilities.

(b) That the fences which in part formed the inclosure were not maintained continuously in condition to keep stock placed in the pasture from passing out, or to exclude outside stock from coming in, in other words, it is insisted by appellants that frequently there were gaps or places where the fence was down, and especially was this true at and after the times when floods covered the land, when driftwood and trees were washed

upon the fence and left there when the water subsided, thus crushing the fence and causing breaks, so that the fence barriers were not such as to amount to continued and exclusive possession under the law. The record discloses that sometimes breaks occurred in the fence, but that they were always repaired within a reasonable time. It is also undisputed that when floods occurred and logs and drift washed upon or against the fence crushing it when the waters subsided, that as soon as the condition of the ground, considering the mud and water, would permit, the broken places thus made were repaired and the effectiveness of the fence restored. This contention cannot be sustained.

(c) That Mack's bayou which formed a barrier on the east was not sufficient in that it was not such as to prevent stock from passing through, or over it, either going in or passing out—was not such barrier as to prevent the egress or ingress of animals. A large portion of the more than 1,000 pages of the statement of facts is covered by evidence on this question.

George Anderson, fifty-one years old, testified that he had lived in the neighborhood of the land all of his life, and was familiar with Mack's bayou. He said: "Speaking from my experience with handling cattle, and knowing what I do in that regard as to how cattle act towards streams that may or may not be sufficient to turn them, Mack's Bayou is the kind of stream that will ordinarily serve as a barrier to keep cattle in and keep cattle out."

F. R. LaFour, sixty-three years of age, farmer and stock raiser, and an ex-sheriff, testified: "When you get to Mack's Bayou, you cannot cross it. You cannot cross Mack's Bayou. I am familiar with the kind of stream Mack's Bayou was at the time Mr. Wilcox used that territory as a pasture, and now. I am familiar with that stream. I have hunted alligators up in there. I do not think you could drive a cow in that bayou at all. I do not think she would attempt it."

Guy Land, fifty years of age, testified: "I am familiar with the kind of stream Mack's Bayou is. It is that kind of stream which under ordinary conditions will serve as a barrier to keep cattle in and other people's cattle out, and horses and things like that. They cannot cross it."

Clint Mayes, fifty-one years of age, testified that he has always engaged in the cattle business, and that after W. D. Wilcox died that he and Sid Wilcox "bought cattle that belonged to the Wilcox estate, and some cattle belonging to the Wilcox and White estates, and we had those cattle in there. We used that pasture for keeping those cattle. When we had those cattle in there, I would go in there and look after them. At that time Mack's Bayou served as part of the inclosure, one of the barriers. We did not have any trouble with cattle going across one way or the other. I think that stream is a satisfactory barrier under ordinary conditions."

S. R. (Sid) Wilcox, sixty years of age, testified: "My father (W. D. Wilcox) had Billy Hilton in there watching the fences when he would not be there. * * * If the fence got broke, we told him always to fix it, and we would pay for it, and he looked out for it. We made payments to him on that account a number of times. The Mr. Hilton I make reference to is dead. Prior to my father's death, I do not think he kept over around two hundred and fifty to three hundred head of cattle in there. * * * While my father was living and had his pasture up there, as I have stated, there was a fence on the east connected with Mack's Bayou at a point there, and then ran northward. We had Billy Hilton to repair it, to put cattle in there, to go around the fence to see if it was up. When we would make those trips up there to look after the cattle, there would not be any other cattle in there, unless Father let somebody put a few head in once in a while. That did happen sometimes. Mack's Bayou at that time was used as one of our barriers or strings for our inclosure. I have been on the banks of Mack's Bayou. I know we could not get a cow in it unless you could run her in it. We had no trouble keeping cattle in the pasture, using that stream as a barrier."

G. V. Mayes testified: "I know where Mack's Bayou is on the ground. I have been to that stream on one or more occasions and have been up and down it. In my judgment as a cow man (he said he had been in the cattle business always) it would serve satisfactorily, under ordinary conditions, as a barrier to keep cattle in and keep others out. When Mr. Wilcox and his boys were pasturing cattle on that space of ground we have already identified as being between Mack's Bayou and the river, they used Mack's Bayou as a part of their inclosure, they used that part as a fence. It served better than a fence. It served better than a fence because a few cattle would crawl through a fence, and I do not think they would go in that bayou. I never did see one go in there."

Lee Swinney testified: "I am familiar with the kind of stream Mack's Bayou is. They have always used it as a barrier to keep cattle within that inclosure, and it has made a mighty good fence. Before I was grown or handled cattle I lived right there in that territory. I was in the marsh every day in the year, practically, when I was a kid, and worked for my daddy handling cattle."

Frank Land testified that he was fifty-five years old; that he moved to Liberty county when he was eighteen years old; that he had been to Mack's bayou many a time. He said:

"When I would be in there, the bayou at that point was of such character that it would act as a barrier to keep cattle in that pasture. It was boggy too. Cattle would bog down. I have pulled a few cattle out of it that were bogged down. I have tried to wade that bayou at that point. I bogged down. * * * When Mr. Wilcox would come up there, he would go to Mr. Billy Hilton's and stay, and he stayed at Jim Worthy's sometimes. I knew Billy Hilton. I lived right neighbors to him. Mr. Hilton would help Mr. Wilcox in working and looking after his cattle that he had in that pasture."

J. H. Worthy, sixty-eight years of age, testified: "I know Mack's Bayou from one end to the other. I am familiar with the nature of stream Mack's Bayou is and has been since I have first known it, from the point where that first old fence touched it, near its head, on down to where Mack's Bayou goes into Lake Charlotte. That was used while Wilcox was pasturing it and since D. Humber has been pasturing it, as a barrier to keep cattle in and out. Within my knowledge of that stream and my experience as a cattleman, and my actual observation, and what has happened there, I think that stream, under ordinary circumstances, would serve as a sufficient barrier. I do not think a cow can cross it to save her life, unless it overflows and she swims it. From my experience in handling cattle, and having had such experience over the entire course of my life, since I was big enough to do that kind of work, a stream of that nature and character will ordinarily serve as a barrier to keep cattle in a pasture or other cattle out. I never knew one to cross it, in all my life."

Other witnesses testified in effect as the above. The issue submitted, together with the instructions of the court, and the special charges requested by appellants, and given, relating to the issue and what the jury must find to answer same in the affirmative, we think correctly given, and the answer of the jury abundantly supported by the evidence. The contentions above noted, under the record, are not sound.

Appellants' tenth, eleventh, and twelfth assignments assert that the court erred in refusing their requested peremptory instruction No. 2, which instructed the jury to return a verdict for plaintiffs for a parcel of land containing approximately 36 acres (estimated by appellees at 23 acres) off of the east end of the tract sued for, describing it by metes and bounds. The 23 or 36-acre tract is shown on the maps in evidence as that portion of the 413.08-acre tract involved that lies east of a red line drawn from a point marked "X" on the south line of the 413.08 acres north to a point marked "M" on the north line of said tract. Appellants insist

that the deeds conveying the land to Wilcox call for the south line to be 2,563 varas in length, and the north line to be 2,743 varas long, and the tract to contain 366 acres, and that the east line is situate as shown by the red line marked "M—X," and so does not include in the description in said deeds the tract or parcel east of the red or "M—X" line, estimated at 23 or 36 acres, for which they should have had judgment. Appellees deny this contention and say that the deeds from Jackson and the McManuses to Wilcox under whom they hold, which conveyed the tract here in dispute, call for the south line of the tract to extend from the river eastward 2,563 varas to an established corner of the adjoining tract known as the Oliver tract, and the east line to go north with the west line of the Oliver 837 varas to corner on the south line of the Clough tract, and the north line to run westwardly from the corner on the Clough 2,743 varas to the river, and thence with the river to the place of beginning. The point "X" in the south line is where 2,563 varas would end. That is not the "established corner of the Oliver." The Oliver corner is about 246 varas east of the 2,563 varas call. The call for the east line to go north with the Oliver (west line) to the Clough tract is met by running that line from the Oliver corner called for in the field notes in the deeds to Wilcox. This also puts the corner on the Clough to be in the north line of the Wilcox, and the location of this line is not disputed. The north line of the Wilcox calls to extend east from the river 2,743 varas to the Clough corner. The 2,743 varas would end at the point marked "M," falling some 300 varas short of reaching the Clough. Appellees say that the call for artificial objects —Oliver corner, Oliver line on the east, and Clough line for the northeast corner of the Wilcox, controls the calls for distance, and the south and north lines must be extended to reach the objects called for; that the calls for distance must yield to and be controlled by the call for artificial objects. There is no dispute as to the location of the Oliver corner called for, or the Clough line.

The rule is well settled that, in locating land lines, calls for natural or artificial objects will control calls for course and distance; that is to say, that calls for course and distance must, in case of conflict, yield to calls for natural or artificial objects. Stafford v. King, 30 Tex. 272, 94 Am. Dec. 304; Thatcher v. Matthews, 101 Tex. 124, 105 S. W. 317; Temple Lmbr. Co. v. Felts (Tex. Civ. App.) 260 S. W. 228; T. P. Coal & Oil Co. v. Crabb (Tex. Com. App.) 249 S. W. 835, 838. The holding of the trial court that the calls in the Jackson and McManus deeds included the land conveyed thereby to the "established corner" of the Oliver tract, and the west line of the Oliver, the locations of

which are not disputed, was correct and the 23 or 36-acre tract was embraced in said conveyances.

■ Appellants' thirteenth, sixteenth, seventeenth, eighteenth, nineteenth, twentieth, twenty-first, and twenty-second assignments complain that the court erred in refusing their requested special issue No. 2, to be answered by the jury in the event they had in answer to special issue No. 1 found that appellees had had peaceable and adverse possession of a substantial portion of the land sued for for ten consecutive years prior to the filing of the suit, and which requested issue read: "When did such peaceable and adverse possession begin, and when did it end?" "Answer, giving the date that it began and the date that it ended."

These assignments are overruled. The charge of the court together with his explanatory instructions relating to the issue submitted, and the special charges given at the request of appellants relating to said issue, set out supra, we think fully covered every phase presented by these assignments. Furthermore, under the evidence in the record, the issue requested was calculated, in our opinion, to have confused the jury in arriving at their answer. The land acquired by Wilcox by the deeds to him in 1901, embracing the land here in controversy, was at the time he acquired same inclosed and being used by his grantors. He immediately took possession and continued to use the land for pasturage purposes when needed, repairing and keeping the fences in usable condition. When he purchased the 229 acres on the north, he permitted the fence on his north line, being the fence on the south of the 229 acres, to go down only because the 229-acre tract was inclosed when he bought it, and continued to keep up the fences of that tract, except the line on the south, his pasture thus increased in area at all times embraced the tract in controversy up to the time of his sale to the Breedens, who at once took possession and continued to use the land to the filing of this suit. So, numerous combinations of dates embracing a ten-year period of possession and use could be had, any one of which was sufficient to support the limitation. We have carefully considered all the cases cited by appellants to sustain their proposition, but do not believe that either of them is in point.

■ The fourteenth and fifteenth assignments urge that the court erred in refusing appellants' requested special issue No. 1, which inquired whether appellees and those under whom they hold, either themselves or by tenants, had peaceable and adverse possession of a substantial part of the land in controversy, using and enjoying the same, for ten consecutive years subsequent to the date that a fence was used or erected by W. D.

Wilcox commencing at a point on Mack's bayou and running northerly to the south line of the Sadie McManus 229-acre tract, and prior to December 5, 1927.

Under these assignments it is insisted that the fence referred to was built in 1907. We have already discussed under first to ninth assignments the matter of the inclosure and barriers around the land in question. The record clearly shows that Wilcox bought the land in 1901, and that at that time it was inclosed and being used by his grantors as a pasture. That he immediately took possession, repaired the fence in question, and continued to use the land as a pasture. Appellants say that "there was no evidence in the record sufficient to sustain a finding by the jury of the fact of inclosure of any substantial part of the land in controversy prior to the time that Wilcox either erected or began to use the fence from the forks of Mack's Bayou northwestward to the southeast corner of Sadie Mack's tract. * * *" This statement, it seems to us, is an admission that the fence might have been in existence prior to 1907. The question of its existence and use by Wilcox at and after his purchase from Jackson and the McManuses in 1901, was passed on by the jury under the issue submitted and has been by us fully discussed herein. The assignments are overruled.

■ The twenty-third, twenty-fourth, and twenty-fifth assignments assert that the court erred in overruling their objections and exceptions to the court's charge wherein he gave explanations relative to the terms "adverse possession" and "continuous and uninterrupted possession," touching in his charge the effect, as a matter of law, temporary gaps or breaks in the fences, if such were found to have existed, and flood periods, if found to have occurred, insisting that said charge was upon the weight of the evidence, and gave undue emphasis to whatever excuses appellees may have had for such conditions, and, further, that the charge indicated to the jury the court's opinion that such gaps or lapses were temporary only. These assignments are overruled. The court correctly defined the terms alluded to, and correctly instructed the jury with respect to the application of said terms to the facts, relating to breaks which at times occurred in the fences relied upon by appellees as being sufficient to inclose the Wilcox (Breeden) pasture; and also relating to periods during which the pasturing of cattle upon the land inclosed was interrupted by overflows from the Trinity river. Moreover, at the request of appellants, the court gave two special charges differing, in effect, but little from the court's charge, but further enlarging same. The contention in the twenty-fifth assignment that the court in his charge assumed that there was an actual and visible appropriation of the land in controversy by appellees is without merit.

The twenty-sixth assignment complains that the court erred in refusing appellants' special charge No. 3 instructing the jury not to consider any evidence of possession, if any, of the land in controversy before the building or use of a fence by W. D. Wilcox from a point on Mack's bayou running northerly to an intersection with the north line of the land claimed by appellees. The testimony to which this assignment relates was that touching the acts of R. O. W. McManus in using a point on the Trinity river known as "Breakover" for the purpose of accumulating wood, and forest, and agricultural products for shipment by ·water from said point to Galveston by boats. All this testimony was admitted without objection, and therefore the court was not required to instruct the jury to disregard same. If appellants thought the evidence inadmissible, it was their duty to object to same when offered, but not having done so, they waived their right to object. Coleman v. Luetcke (Tex. Civ. App.) 164 S. W. 1117; Hemler v. Hucony Gas Co. (Tex. Civ. App.) 18 S.W. (2d) 942; Norwich Union Indemnity Co. v. Wilson (Tex. Civ. App.) 43 S.W.(2d) 473. Having waived their right to object to the testimony at the time it was offered, appellants could not exclude same from the jury's consideration by having the court give a special charge not to consider such testimony. Nalle v. Gates, 20 Tex. 320; Missouri Pac. Railway Co. v. Mitchell, 75 Tex. 80, 12 S. W. 810; Missouri, K. & T. Railway Co. v. Edling, 18 Tex. Civ. App. 171, 45 S. W. 406, 409; White v. Pyron (Tex. Civ. App.) 62 S. W. 82; St. Louis & S. W. Railway Co. v. Foster (Tex. Civ. App.) 89 S. W. 450; Galveston, H. & S. A. Railway Co. v. Harden (Tex. Civ. App.) 236 S. W. 146, 150. Moreover, we think the testimony was admissible for whatever it was worth—its weight was for the jury.

The twenty-seventh and twenty-eighth assignments urge that the court erred in admitting in evidence the deed from the tax collector of Liberty county to R. O. W. McManus of date August 6, 1878, and a certain judgment rendered by the district court of Liberty county in 1920, styled A. C. Breeden v. Unknown Heirs of B. M. Spinks. We have carefully examined the record (transcript and statement of facts) and fail to find where appellants objected to admission of said instruments. On pages 311 and 312 of their brief appellants say that certain objections were made to the introduction of the tax deed, and refer to their forty-ninth assignment of error on page 114 of the transcript. Also on page 319 of their brief they state objections made to the introduction of the judgment mentioned, and refer to their fiftieth assignment of error on page 115 of the transcript. The assignments are merely appellants' statements—they are not bills of exceptions. It not appearing that objection was made to the introduction of either of the documents, the assignments urged are not before us for consideration.

The thirtieth proposition as presented in appellants' brief, page 321, recites that it is identical with their fiftieth assignment of error and refers to page 115 of the transcript. As urged and argued, it complains that the court erred in refusing to give their requested peremptory charge against appellees on the ground that appellees were estopped in law by recitations in the deeds under which they held and claimed the O. M. Breeden 229-acre tract immediately south of the tract in litigation, from claiming and asserting title to the tract in controversy by limitation or otherwise, insisting that the recitations occurred in appellees' chain of title to the 229-acre tract as early as 1877, and as late as 1920.

The fiftieth assignment with which appellants say this proposition is identical, found in the latter part of appellants' brief, and at page 115 of the transcript, in no wise relates to the question of estoppel, but is wholly related to the asserted error in the court permitting the introduction of the judgment in the case of A. C. Breeden v. Unknown Heirs of B. M. Spinks, alluded to and made the basis for the twenty-eighth assignment. The thirtieth proposition having no basis in the fiftieth assignment, upon which it is based, and with which it is said to be identical, furnishes no question for consideration. An inspection of appellants' propositions set out in the first part of their brief, discloses that the thirtieth proposition is the fifth assignment of error, on page 70 of the transcript and on page 334 of the brief, submitted as a proposition. So, as before stated, the assignment (fiftieth), as referred to in the brief and transcript, affords no basis for the proposition, and it does not devolve upon us to search the record to ascertain whether or not a basis in other assignments may exist for the proposition, and same should not be considered.

However, if it can be said that we should consider the assignment, we overrule same. Appellants refer to several deeds and to one judgment and set forth the recitals in them upon which they rely in support of the propositions. One of the deeds is not a link in any chain of title under which appellees hold the land in controversy, or under which they hold the 229-acre tract mentioned. The other deeds and the Breeden-Spinks judgment all describe the lower 229 acres by reference to the adjoining tract on the north of the 229 acres. This adjoining tract on the north is the land in controversy, and in said deeds and judgment is referred to as the Halsey tract. The 229-acre tract so described is the land conveyed by Cummings to Wilcox in 1901, and of which O. M. Breeden became the owner by subsequent deeds. The rule stated by appellants that "all parties to a deed, and those

claiming through them, are bound by the recitals in it legitimately appertaining to the subject matter of it," is correct, but as we think, without application here. The subject-matter of the recitals here discussed was the description of the lower 229 acres of land itself, which merely made reference as a matter of description and location of the 229-acre tract, to the adjoining tract called the Halsey tract. These deeds, nor the judgment in the Breeden-Spinks case, in no wise recognized title in Halsey to the referred to tract at that time, but alluded to same for the purpose of describing and locating the 229-acre tract, the subject-matter of the deeds and judgment. We do not believe it can be said that the mere mention of an adjoining tract of land in describing the location of another tract being conveyed, is in any sense a recognition of title to the adjoining tract in the party in whose name same is mentioned. The reference is intended as a matter of description only of the tract being conveyed and not of title to the adjoining tract. Appellants have not cited us to any case so holding, and we do not think any such case can be found.

This opinion has grown into inordinate length, but because of the enormity of the record, and great length of the briefs, and the many points involved, we have endeavored to thoroughly consider and discuss same. Finding no error, the judgment should in all things be affirmed, and it is so ordered.

Affirmed.