### GALVESTON, H. & S. A. RY. CO. v. HARDEN. (No. 1269.)

(Court of Civil Appeals of Texas. El Paso. Dec. 21, 1921. Rehearing Denied Jan. 12, 1922.)

**1. False imprisonment ⬡➡39—Peremptory instruction on issue of illegal arrest on telegram held properly refused.**

Where defendant railway company's special agent co-operated with police officers of a city in sending a telegram to an officer in another county, offering a reward for plaintiff's arrest for murder, and stating that the officer signing the telegram had a warrant, which was not issued until the next day, and was not transmitted by telegraph to receiving officer who acted on the telegram, which did not contain sufficient information to file a complaint, defined by Code Cr. Proc. 1911, art. 269, and obtain a warrant, *held* that defendant was not entitled to a peremptory instruction on the theory that an illegal arrest without the issuance of a warrant was not contemplated.

**2. False imprisonment ⬡➡15(3)—Principal liable for agent's wrongful act in course of employment.**

To render a railway company liable in actual damages for unlawful arrest and imprisonment procured by its agent, it is not necessary to show that it had expressly authorized him to do the wrong complained of, but it is liable for his wrongful act committed in the course of its employment, though the particular act was not authorized.

**3. False imprisonment ⬡➡39—Railroad agent's authority to cause arrest held question for jury.**

In an action against a railway company for false imprisonment, facts affirmatively pleaded by defendant in connection with evidence adduced *held* sufficient to justify submission of

---

⬡➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the issue of a special agent's authority to act for defendant in procuring the arrest.

**4. False imprisonment ⬤═39—Officer's possession warrant held question for jury.**

In an action against a railway company for false imprisonment, evidence held to make it an issuable fact whether the officer in pursuit of plaintiff possessed a warrant for his arrest when he took him into custody from authorities of another county who acted on a telegram in arresting him.

**5. Trial ⬤═105(1)—Instruction objecting testimony after admission properly refused.**

A requested charge, directing the jury not to consider testimony admitted without objection, *held* properly refused.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Suit by Mitchell Harden against the Galveston, Harrisburg & San Antonio Railway Company, for damages for unlawful arrest and false imprisonment. Verdict and judgment for plaintiff, and the defendant appeals. Affirmed.

Beall, Kemp & Nagle, of El Paso, for appellant.

Neill & Armstrong, of El Paso, for appellee.

HIGGINS, J. Appellee brought this suit against the appellant to recover damages for unlawful arrest and false imprisonment. A verdict was returned and judgment rendered in his favor for $600.

There is evidence to establish the following facts:

On the night of May 25th, 1920, Harry Northrup was shot and killed in appellant's yards in the City of El Paso. The deceased was an employee of appellant, and it was his duty to patrol its yards, protect its property, and prevent thefts from its cars. He was killed in the discharge of his duty. On the night of the homicide appellee left El Paso, where he had resided for some time, and went to his former home in Austin, where his father and other relatives lived. He reached Austin on the night of May 26th, and went to the home of relatives. At the time appellant had in its employ a special agent named W. J. Armfield. Upon the murder of Northrup the officers of the city and county of El Paso diligently sought to ascertain who the murderer was and to apprehend him. Appellant and its agents co-operated with them in their effort to locate and bring to justice the party guilty of Northrup's murder. The appellant's special agent, Armfield, acted in that connection for it. On the night of May 28, Charles Matthews, commonly known as Billy Smith, Detective Sergeant of the city of El Paso, Ed Smith, who was also a city detective, and Armfield went to the residence of Charles Leavell,

plaintiff's employer, in El Paso, for the purpose of arresting him as the slayer of Northrup. They there learned that plaintiff had gone to Austin. They then went to the office of Armfield, where a telegram was written, reading as follows:

"Chief of Police, Austin, Texas.

"Fifty dollars reward for the arrest of Mitch or Mitchell Harden; his wife's mother lives at 1906 East 16th street. He has a father John Harden living in Austin, unable to get his address. We want this man very badly for murder. We hold warrant. He has a wife here who mailed him post office money order Wednesday morning. Very likely catch him when he calls at post office to cash same. We have direct information that he is now en route or there. He left here Tuesday twenty-fifth. If arrested advise at once.

"J. R. Montgomery, Chief of Police."

Billy Smith testified that Armfield took them to the Leavell home, and that they went there at his instance; that the telegram was dictated by Armfield to Armfield's stenographer; that he (Smith) knew the name of Montgomery, police chief of El Paso, was signed to the telegram, and that he was authorized by Montgomery to sign the chief's name to telegrams; that he told Armfield they would sign the chief's name to the telegram, "providing we had the party dead to rights, and he (meaning Armfield) says: 'We have him dead to rights' (meaning Mitch Harden)."

Ed Smith's testimony substantially corroborates that of Billy Smith, except that he says the telegram was dictated jointly by Armfield and Billy Smith.

Armfield testified that Billy Smith dictated the telegram to the stenographer; that Montgomery's name was signed thereto by Smith's direction; that a messenger boy was then called and the telegram dispatched; he (Armfield) paying for its transmission.

The telegram was received by the Austin chief of police, and, acting thereon, he and other officers arrested plaintiff at the post office in Austin about 1 p. m. on May 29, 1920. The Austin chief testified that the only authority he had for the arrest was the telegram. Plaintiff was placed in jail in Austin, and held there for two or three days until Armfield and Ed Smith arrived. He was then delivered to Smith, who, with Armfield, took him over the Houston & Texas Central Railway to Houston, where he was confined in jail for several hours. They then brought him back to El Paso and lodged him in jail.

On May 29th, Juan Franco, an El Paso city detective, filed with Justice of the Peace Rawlins a complaint charging plaintiff with the murder of Northrup, and thereupon the justice issued a warrant for plaintiff's arrest, directed to El Paso county. The warrant was not produced upon the trial, and it

appears to have been lost. The justice testified that his recollection was he gave it to Franco at the time it was issued. Plaintiff was not indicted by the grand jury, and was afterwards released. Subsequently one Eugene Ward was indicted for and convicted of the Northrup murder.

The court instructed the jury as follows:

"(4) By the term 'false imprisonment,' as used herein, is meant the direct restraint by one person of the physical liberty of another, without adequate legal justification. Any exercise of force, or express or implied threats of force, by which, in fact, the other person is deprived of his liberty or compelled to remain where he does not wish to remain, or go where he does not wish to go, is an imprisonment. That imprisonment by an officer under a warrant, issued by legal authority, is not a false imprisonment, but is a legal imprisonment. However, an imprisonment may be false even if a valid warrant has issued for a party, if the imprisonment is not under the warrant, and, in order to justify the arrest and detention of a person under a warrant, the officer making such arrest and imprisonment must have said warrant in his possession.

"That the purported reproduction of the warrant introduced in evidence is in form a valid legal warrant, and such a warrant would justify the arrest and detention of Mitchell Harden by any peace officer in the state holding same; that the telegram introduced in evidence, dated El Paso, Tex., May 28, 1920, addressed to the chief of Police, Austin, Tex., purporting to be signed J. R. Montgomery, chief of police, presents no legal justification for either the arrest or detention of the said Mitchell Harden.

"(5) The acts of railroad employees, acting within the course of their employment, are the acts of the railroad company, but the acts of an employee of a railroad company acting outside of the course of his employment are not the acts of the company.

"(6) Now, therefore, you are instructed that if you find from a preponderance of the evidence that the agent of defendant, acting in the course of his employment for defendant, alone or jointly with peace officers of the city of El Paso, Tex., caused the telegram dated May 28, 1920, addressed to the chief of police, Austin, Tex., purporting to be signed J. R. Montgomery, chief of police, to be sent, and as a direct result thereof the plaintiff, Mitchell Harden, was arrested and placed in jail at Austin, Tex., and it could have been reasonably anticipated by the said agent of defendant, then so causing said telegram to be sent, if he did so cause said telegram to be sent, that plaintiff, Mitchell Harden, would be so arrested and incarcerated without further warrant of law, and as a result of such arrest and incarceration of Mitchell Harden he suffered damages, then your verdict will be in favor of the plaintiff.

"(7) If you find from the evidence that defendant's agent did not cause said telegram to be sent, acting alone or jointly with the peace officers of the city of El Paso, Tex., then your verdict will be for the defendant. Or, if you find he did cause same to be sent, but further find that he was not acting in the course of his employment for defendant, then your verdict will be in favor of the defendant; or, if you find that he did cause same to be sent, and he was acting in the course of his employment, but that it could not have been reasonably foreseen that so sending said telegram, if same was sent by him while so acting, that same would result in the illegal restraint of plaintiff, then your verdict will be for the defendant.

"(8) You are instructed that if Ed Smith had, at the time he took plaintiff in his custody in Travis county, in his possession a warrant issued on the 29th day of May, 1920, by R. B. Rawlins, justice of the peace, precinct No. 1, El Paso county, Tex., directed to the sheriff or any constable of El Paso county, in substance directing the arrest of Mitchell Harden, and requiring that he be brought before such magistrate in El Paso, Tex., in said county, instanter, then and there to answer the state of Texas, for an offense against the laws of said state, to wit, murder, that the detention and imprisonment of the said plaintiff thereafter was legal, and plaintiff, if entitled to recover, would not be entitled to recover for any damages accruing after he was so held under said warrant.

"(9) You are instructed that if you find for the plaintiff, you will allow him such a sum as you find from a preponderance of the evidence will reasonably compensate him for the damages, if any, proximately caused by such false imprisonment, and if you believe, as a proximate result of such false imprisonment, plaintiff suffered fear and humiliation, you may take that into consideration in assessing your damages, if any."

It is contended that a peremptory instruction in appellant's favor should have been given because:

"First. It could not have been contemplated by the defendant or any person sending the telegram in question that plaintiff would not be legally arrested or that he would be arrested without the issuance of a warrant in the city of Austin.

"Second. The evidence did not show that any agent of the defendant company, acting within the scope of his authority, had done anything in connection with the arrest or alleged false imprisonment of plaintiff."

In support of the first proposition appellant relies upon the case of Meyer v. Monnig Dry Goods Co., 189 S. W. 80. In that case a theft was reported to a policeman by the defendant's manager, and such manager pointed out Mrs. Meyer as the guilty person. The officer had no warrant for her arrest. When Mrs. Meyer was pointed out to the officer as the guilty person she ran out of defendant's store into an alley at the rear, where she was overtaken and held by R. B. Baker, a salesman of defendant, until the arrival of the officer, who at once arrested and imprisoned her in jail. The act of Baker was in obedience to an order to him of the police officer. Subsequently a complaint was filed and a warrant issued. It was held that the Dry Goods Company was not liable under the circumstances for

the arrest of the plaintiff, even if it were unlawful, the court saying:

"But aside from that question the evidence shows conclusively that the arrest and prosecution were solely upon the volition of the policeman and other public officers, and not upon request or direction of any of the defendants. Defendant Wandry, as it was his legal right and duty to do, reported the theft to the policeman, and pointed out to him Mrs. Meyer as the guilty person. He did nothing more than that. Even if he had requested the arrest, it could not be presumed that he thereby intended an unlawful arrest. There was no evidence whatever that the act of Baker in pursuing and stopping Mrs. Meyer in her flight, and detaining her until the arrival of the officer, who then took her in custody, was in any manner authorized, instigated, or directed by any of the defendants, but was by reason alone of the order of the officer so to do, and therefore they are not responsible therefor. And neither he nor the officer was made a party defendant in the suit. Hence, even though it should be said that in arresting Mrs. Meyer the officer did not follow the preliminary legal steps necessary to make the arrest strictly lawful, the evidence conclusively shows that the defendants are not liable for any damages resulting therefrom, or from the incarceration which followed the arrest."

It may be conceded that under the facts of that case the ruling was correct, but it is not applicable in the case at bar.

[1] The telegram informed the Austin authorities that Harden was charged with murder, and offered a reward for his arrest. It conveyed the impression that he had fled from El Paso county, and was badly wanted by the El Paso officers. It informed them that the El Paso authorities had a warrant, which was not true, for the warrant was not issued until the next day. And when it was issued it was not transmitted by telegraph, as the law authorizes. The telegram did not contain sufficient information to enable the Austin authorities to file a complaint there and obtain a warrant. See article 269, Code Crim. Proc., "Requisites of Complaint."

All of the circumstances tend strongly to show that the object and purpose of the telegram was to secure the arrest of Harden at the earliest possible moment and in view of the failure to transmit by telegraph the warrant issued on the 29th and the failure to furnish the Austin authorities with sufficient information to file a complaint there and procure a warrant, the defendant and its agent Armfield must be held to have contemplated that the Austin authorities would act upon the telegram and arrest the plaintiff as soon as possible, regardless of the want of a warrant. Taylor Bros. v. Hearn, 63 Tex. Civ. App. 333, 133 S. W. 301.

[2] As to the second contention made by appellant the evidence does not disclose with certainty the exact scope of the authority conferred by appellant upon its special agent Armfield. But in order to render it liable in actual damages for the unlawful arrest and imprisonment of plaintiff it was not necessary that it had expressly authorized the agent acting for it in the matter to do the specific wrongful acts complained of. The defendant is answerable for the wrongful act of its agent committed in the course of his employment, and this is so though the particular act was not authorized by it. Rucker v. Barker, 108 Tex. 280, 192 S. W. 528.

[3] The defendant in its answer affirmatively and distinctly alleges that the officers of the county and city of El Paso had called upon it and its agents to co-operate with them in the endeavor to locate and bring to justice the parties guilty of Northrup's murder; that defendant did co-operate with the officers in their effort to detect and arrest the guilty parties, and that the said officers and the agents of defendant were informed and led to believe by parties claiming to know the facts that the plaintiff was the guilty person; that it had no ill will or malice against plaintiff, and what it did, if anything, in connection with his arrest and prosecution was done without malice or ill will, and was done to vindicate the laws of the state, and under the belief that the plaintiff was the guilty person, and upon reasonable grounds for so believing, Armfield was called as a witness by defendant. The following excerpts from his testimony are quoted:

Direct Examination. "My name is W. J. Armfield. I am a special agent of the G. H. and was such in May, 1920. * * * I had under investigation the matter of attempting to find out who committed the crime, and co-operated with the city detective force of the city of El Paso. The sheriff's office didn't take any interest in it at the time. I conferred with Capt. Claude Smith of the detective force, and with Billy Smith—or Billy Matthews—and with Ed Smith. Claude Smith and Ed Smith are brothers. There was a conference in my office at the time a telegram was sent. Billy Matthews, Ed Smith, Fraser, F. M. Robinson, my stenographer, Wilson, and myself were present. There was a telegram sent out of that office to the chief of police of Austin. It was written on the typewriter, by Mr. Wilson. Mr. Matthews dictated the telegram, and the name of J. R. Montgomery was signed to it under Mr. Matthews' directions. When I say Mr. Matthews, I mean Billy Smith, Australian Billy Smith. As to what led up to the sending of that telegram, on the night of May 28th, Branch, who was one of the dining car negroes, and who had been arrested by Captain of Detectives Claude Smith, informed me that he knew the party that had killed Harry Northrup. I called the captain of detective's office, Claude Smith's, and asked for Mr. Smith. He wasn't in his office, and Billy Matthews answered the phone. I told Mr. Matthews what Branch had said, and he stated that he and Mr. Fraser and Ed Smith would come to the office immediately, which they did. Branch related the same story

to Billy Matthews, sergeant of detectives, that he had to me. Branch stated that Ben Crawford, G. H. train porter, knew the man that was to go out on No. 10 that night. Billy Smith, myself, Mr. Robinson, Mr. Fraser, and Ed Smith got in an automobile and went to Ben Crawford's house. Billy Smith asked Ben Crawford if he knew the negro he had made arrangements with to go out on No. 10 that night to Austin, Tex., and he told him that he did. He asked him who it was, and he told him it was Mitch Harden. * * * Billy Smith then called up Western Union and asked them to send a messenger for the telegram, and I paid for the transmission of it. I went to Austin later, and there was the plaintiff; he was in the county jail. I didn't take the plaintiff down to Houston, but I went with those who did. * * *"

Cross-examination. "Yes, sir; I did go to Austin. I went with Ed Smith, because he asked me to go along with him. It was not a pleasure trip to Austin, I went with Mr. Smith, and Mr. Smith was going after Mitch Harden. Sure I went with Mr. Smith to get Mitch Harden. The Galveston, Harrisburg & San Antonio furnished the transportation for Mr. Smith, at my request. I was acting, at the time, as an employee of the Galveston, Harrisburg & San Antonio Railway Company, in requesting this transportation. * * * When I left El Paso with Mr. Smith, I had a pass for him. I carried it. It was not a card or book; it was a small piece of paper, and was issued through the superintendent's office. It did not name Mr. Smith by name, but said to pass two persons. Those two persons were Mr. Smith and Harden; I didn't need a pass. The pass read to Austin and return, and was over the Southern Pacific Lines, which were the Galveston, Harrisburg & San Antonio and Houston & Texas Central. * * *"

Neither Armfield nor any other witness denied his authority to act for defendant in its admitted effort to aid the officers of the law in detecting and arresting the slayer of Northrup, and the exact scope of Armfield's authority and the duties of his employment were matters peculiarly within his and the defendant's knowledge.

In our opinion the facts affirmatively pleaded by defendant, in connection with the evidence adduced, were sufficient to raise the issue of Armfield's authority to act for defendant, and the court did not err in submitting the issue to the jury for its determination. Southwestern Portland Cement Co. v. Reitzer, 135 S. W. 237; M., K. & T. Ry. Co. v. Warner, 19 Tex. Civ. App. 463, 49 S. W. 254; Texas & Pacific Ry. Co. v. Parker, 29 Tex. Civ. App. 264, 68 S. W. 831; M., K. & T. Ry. Co. v. Thompson, 183 S. W. 8; San Antonio & Aransas Pass R. Co. v. Griffin, 48 S. W. 543; Taylor Bros. v. Hearn, 63 Tex. Civ. App. 333, 133 S. W. 301; Eichengreen v. Louisville & Nashville R. Co., 96 Tenn. 229, 34 S. W. 219, 31 L. R. A. 702, 54 Am. St. Rep. 833.

[4] The second assignment of error complains of the refusal of a requested charge to the effect that—

"The uncontroverted evidence shows that the plaintiff, Mitchell Harden, was turned over to the peace officer, Ed Smith, in Austin, Tex., under a valid warrant then held by the said Ed Smith, said warrant having been theretofore lawfully issued by a magistrate of El Paso county, Tex., and that after the said plaintiff was turned over to said Officer Smith by the county jailer of Travis county, Tex., the custody of said plaintiff was lawful."

Justice Rawlins testified that he issued a warrant, and his recollection was that he gave it to Juan Franco, who made the complaint; if it had been returned, it was mislaid; that he had not seen it, although he had made a search and could not find it, but it seemed to him that it was returned, but he did not remember what officer made the return. It is true Armfield testified that the warrant was in Ed Smith's custody in Austin when Brady, the Austin officer, turned Harden over to him. Brady also testified that Smith told him he had a warrant, and started to show it, but that he told him it was unnecessary. But on the other hand, Ed Smith testified that he did not remember whether he had the warrant, and that he was unwilling to testify whether Brady had testified correctly or not.

Appellee testified that no papers were served on him, given him, or shown him; and that they did not serve him with a warrant, and nothing at all was ever read to him. Upon this testimony we are of the opinion that it was an issuable fact whether Ed Smith possessed a warrant for appellee's arrest when he took him into custody in Austin from the authorities there, and that the court did not err in submitting the issue.

[5] Under the third assignment appellant complains of the refusal of this charge:

"You are instructed that you can in no event consider the testimony of the plaintiff, Mitchell Harden, to the effect that Chief Detective Martin, in Travis county, told him when they went out of the post office to run and die, as the defendant would in no event be liable for such act on the part of Martin if he did make such statement."

So far as this record discloses, this testimony was admitted without objection. Under such circumstances the refusal of the requested charge presents no error. Nalle v. Gates, 20 Tex. 315; Maverick v. Maury, 79 Tex. 435, 440, 15 S. W. 686; White v. Pyron, 62 S. W. 82; St. Louis & S. W. Ry. Co. v. Foster, 89 S. W. 450.

The remaining assignments of error simply present, in a different form, the propositions heretofore indicated. Under the rulings made none of them present reversible error, and they are overruled.

Affirmed.