LEON'S SHOE STORES, Inc., Appellant,

v.

Mary Lou HORNSBY et vir, Appellees.

No. 3508.

Court of Civil Appeals of Texas.

Waco.

Oct. 10, 1957.

Rehearing Denied Nov. 7, 1957.

Naman, Howell & Smith, T. George Chase, Waco, for appellant.

Zachry & Jones, Waco, for appellees.

TIREY, Justice.

Appellees brought this suit for damages and false imprisonment. At the conclusion of the evidence the court overruled defendant's motion for instructed verdict and submitted two issues to the jury. They are: "(1) Do you find from a preponderance of the evidence, if any, that the defendant, its agents, servants or employees, caused the plaintiff, Mary Lou Hornsby, to be falsely imprisoned? Answer 'Yes' or 'No,'" to which the jury answered "Yes." "(2) What sum of money, if any, do you find from a preponderance of the evidence, if any, will fairly and justly compensate the plain-

tiff in this case for her damages, if any? Answer in dollars and cents," to which the jury answered "$800.00."

The court overruled defendant's motion for judgment non obstante veredicto and granted plaintiffs' motion for judgment and the judgment followed the verdict. Defendant seasonably filed its motion for new trial, and, it being overruled, perfected its appeal to this court.

Appellant has assailed the judgment on what it designates as six points. Point 1 is: "The uncontroverted testimony in the record wholly fails to prove that the defendant or its agents or servants arrested the plaintiff unlawfully or that the defendant, its agents or servants, directed or requested an arrest to be made, lawful or unlawful, and therefore an instructed verdict for the defendant should have been given." Points 2, 3, 4, 5 and 6 are substantially to the same effect.

A statement is necessary.

Appellant is a corporation engaged in the retail business of selling shoes and operates its retail store under the trade name of "Cinderella Slipper Shop." The store has been operating under this trade name for some twenty-seven years. Appellee, Mary Lou Hornsby, testified to the effect that she is a registered nurse employed by the Veterans Administration Hospital in Marlin; that she finished her schooling at the University of Columbia in New York City and had lived in Central Texas for approximately four years; that she has a husband and two small boys. Appellee said that she had occasion to go into the Cinderella Slipper Shop on November 28, 1956, for the purpose of asking them to cash a check for her for $5; that she had been a customer of the store for some time and that while she had been a customer of the store she had been waited on by Mr. Peach, and that some months before November 28, 1956, she had opened a charge account at the store and that Mr. Peach introduced her to Mrs. Thad Sharp, who was the

credit manager and with whom she opened her account. It appears that appellee had made two purchases on October 16, 1956, for two pairs of shoes, one for $19.95 and one for $12.95, which were charged to her account; that thereafter, on November 21, 1956, she issued her check drawn on the Marlin National Bank of Marlin, Texas, which check was payable to the order of Cinderella Slipper Shop for $25, signed by appellee. Her address was given as 503 Commerce, and her telephone number as 62698, and on the check was this notation: "This has been written since report of loss check. Please accept same." This check was accepted by the Cinderella Slipper Shop and was paid when it was presented at the Marlin Bank. When appellee went into the store on the morning of the 28th of November she talked with Mrs. Smith, who was at the cash register, and explained to Mrs. Smith who she was and told her that she was a customer of the store and that she wanted to cash a check; she told Mrs. Smith in effect that she had lost some checks and it was necessary for her to put some notations on the check so that the bank would recognize her check and protect her against whoever had been forging her name. (Perhaps we should point out here that when appellee lost her billfold and identification slips and some checks and later found these checks were cashed against her account, she went to the President of the Marlin Bank and explained the situation that she was in and the Bank refunded the checks that had been passed against her and she made an agreement with the Bank as to how she should draw her checks in the future and arranged for a notation to be put on the checks so that the bank would recognize her checks by this notation, which was more or less a code number, and prevent the party who had forged her name from passing any more checks against her account. The bank president had appellee sign some statements concerning her story and then the bank president passed this information on to the Chief of Police for the City of Marlin, and the Chief of Police of the City of Marlin, on the 28th of November, made a trip to Waco to acquaint the Police Department of the City of Waco with the situation that someone in Marlin had been passing forged checks on the account of appellee, and just prior to the 28th of November the Cinderella Slipper Shop had received what they term an "SOS" showing that someone was passing forged checks on the account of appellee and this information was passed down in the form of a note to Mrs. Smith, who was in charge of the cash register, and she had it where she could easily observe it.) Mrs. Smith took the check to the credit manager and then came back and reported to appellee that the credit manager would be down in a few minutes and O. K. the draft; that about ten minutes later the credit manager came down and said she could not honor the check presented but that if appellee wanted to put it on her account, they could do that. Appellee did not want to handle the check in that way because she wanted the money. About the time the credit manager told her she could not honor the draft, she noticed two policemen walking in and standing in the door and that they were looking at her; that the credit manager handed the check to her and she started to walk out of the store, and between the door and the alcove one of the policemen said to her, "Wait girl and hand me that" and that she gave the check to him; that one of the policemen told her to wait there and she waited with one policeman while the other one went back into the store; that this policeman later came back and told the other policeman to take her to the car and the other policeman went back into the store and stayed about fifteen minutes; that she was carried to the policeman's car and waited in the car with the policeman for some fifteen minutes, when they took her to the City Hall; that she did not have an opportunity to explain to them fully what she had done

and the policemen took her to the Police Department and began questioning her; that at the time she was in the store she had on her nurse pin and nurse ring and that they had the year she graduated and her name on them, and she also had her tag receipts; that she gave the officers all of the information she had and told them about Mr. Peach in the store who could identify her. (Mr. Peach was not tendered as a witness and the record fails to show that the officers communicated with Mr. Peach.) The policemen called some women, whose names were not given, to see if they could identify her but none of these women was able to identify appellee, and after this she was carried upstairs and fingerprinted and all of her identification, rings, etc., were taken from her and she was placed in a jail cell; that she was arrested by the officers about 3:30 P. M., and was released about 8:00 P. M. of the same day; that she was detained approximately five or five and one-half hours; that she had never been arrested or placed in jail before; that she was most excited; that she was greatly humiliated and embarrassed in carrying on her work and that it had handicapped her in carrying out her duties as a nurse and that she had not been able to rest at night because of this experience:

"Q. Tell this jury, Mary Lou, whether you were interested in protecting the bank and the general public from being swindled on checks that were written on your name, with your name? A. While these checks were being passed I had no other way of securing myself and the bank from letting other people have advantage of my account, and the reason I went down and had an understanding with the president of the bank that I would write my name in full and use a code was that no one else could write on my account. * *

"Q. How long had you known Mr. Peach? A. I had not known

Mr. Peach very long, sir. I told him who I was and he said that he had a wife that worked at the VA Hospital and that he wanted to help me, and he did.

"Q. Did Mr. Peach introduce you to this lady that was on the stand here this morning? A. He did.

"Q. How long were you with Mrs. Sharp in arranging this charge account there? A. I had come in contact with Mrs. Sharp during the time of the account and several other times when I went in to make a purchase.

"Q. Did you maintain your account there in an orderly fashion? A. I did, sir.

"Q. Pay your bills as they became due? A. I did.

"Q. Were there ever any times that there was any feeling between you and Mrs. Sharp other than this very friendly meeting? A. No indeed. The people at Cinderella have been real wonderful up until this time. In fact, I like Cinderella's products. I still do."

The account introduced in evidence by defendant shows that after the payment of the check on November 21, 1956, there was a balance due on the account of $7.90, so at the time she entered the store on November 28, 1956, her unpaid balance was in the amount of $7.90.

Mrs. Ed Smith testified to the effect that she was a saleslady and cashier at Cinderella Slipper Shop, and that at the time appellee entered the store she was standing behind the cash register; that appellee asked her to cash a check for $5 and told her she didn't have any identification; that someone had stolen it; that she presented her with a draft and she wrote the check; that she told her she would have to get it O. K'd and that she carried it upstairs to Mrs. Sharp.

"Q. Did she tell you that she wanted a draft so the bank would know that it was her signature rather than the individual who had been forging checks on her? A. She told me that she wanted a draft because of her—everything was stolen from her.

"Q. And did you observe her make a little note up in the corner of that check, a little code number so her banker would know about it? A. Yes, sir.

"Q. And did she claim to you that she had talked to her banker and made arrangements to write the check in that manner? A. She told me that her banker would authorize that that was up there in the corner.

"Q. Did you ask her any further questions about it at that time? A. No.

"Q. Did she tell you that she knew Mr. Peach there in the store who could identify her? A. Yes. * *

"Q. Did you tell Mrs. Sharp or anybody upstairs when you went up there about her telling you that Mr. Peach there in the store knew her? A. No, because none of the men in the store O. K. our checks.

"Q. I didn't ask you that, Mrs. Smith, I just asked you did you tell her that Mary Lou Hornsby had told you that Mr. Peach there in the store knew her and could identify her? A. No.

"Q. Did you tell the police officers when they came in that Mr. Peach could identify this girl? A. I didn't talk to anybody. I didn't talk to no police officers.

"Q. Mrs. Smith, I asked you this question the other day, I asked you that same question, if you told the police officers anything about Mr. Peach in the store being able to identify her, and then I asked you this question: 'Q. You didn't tell anybody that Mr. Peach there in the store would be in a position to identify her?' Your answer 'I told—I believe I told Mrs. Sharp when I was upstairs that she said she knew Mr. Peach.' Is that correct? * * * Is your statement here correct, Mrs. Smith, or is the one that you gave the jury here this afternoon correct about that? * * * You have told the jury that you didn't tell them anything. Now which is correct, Mrs. Smith? A. I don't really—I might have told them that she knew Mr. Peach."

Mrs. Sharp, Credit Manager, testified in part:

"Q. Mrs. Sharp, we took your deposition a few days ago, didn't we? A. Yes.

"Q. I'll ask you if you testified to this: 'Q. Did Mrs. Smith tell you that she had told you (meaning Mary Lou Hornsby) that Mr. Peach could identify her?' Did she tell you that? A. I don't believe—I don't remember her telling me that Mr. Peach could. * * *

"Q. All right. Did she explain to you that the reason why she wanted a draft was because checks had been forged on her and she had a certain identification that she put on the draft? A. She may have explained this to Mrs. Smith.

"Q. I asked you that question the other day, didn't I? Now tell the jury if this is not the answer you gave me. 'Well, Mrs. Smith told me that the little notation that she made in the corner of the check was hers, that she and her banker had decided to put that on there. Yes, she told me that.' A. Well, maybe she did.

"Q. Then you were wrong when you told this jury you were not informed of any of these things at all, weren't you, and you didn't mean to mislead them? A. No, I didn't mean to mislead them. I know there was some discussion afterward. I don't remember whether she told me that before when she brought the check in or not, not definitely.

"Q. And after receiving the information from your cashier you went ahead and called the Police Department and reported Mary Lou Hornsby being in there attempting to pass a check? A. That's right. We reported the fact that there was such a person in our store to cash a check.

"Q. And then in a few minutes the police arrived at your store and placed her under arrest? A. They came in our store, but they didn't place her under arrest at our request, or in our store. They came in our store, that's true, but they didn't arrest her in our store. * * *

"Q. If the police officer said that some of the employees in your store pointed her out as the culprit up there, then he is just mistaken? A. Well, I told him that the girl that had walked out of the store was the one that we had called about, reporting the fact—

"Q. Otherwise, the police officer wouldn't have known who Mary Lou Hornsby was? A. Well, I don't know, I don't suppose they would have.

"Q. Did you have quite a few customers in the store? A. No, sir.

"Q. Now, after they carried her to the police station, did you have any further conversation with Lt. Royals? A. I am not sure whether it was Mr. Royals or not. Someone called me from the police station about 5 o'clock and told me that they were inclined to believe her story, and I told them by all means to let her go. I wasn't asking them to hold her. I never did ask them to pick her up.

"Q. Isn't it a fact you told Mr. Royals down at the police station—before 5 o'clock he called you and told you he felt like he had made a mistake and these other women had refused to identify this girl—A. Yes.

"Q. And didn't you tell him at that time that there was a Mary Lou Hornsby who had an account there but it was a white girl from Marlin? A. No, sir, I did not.

"Q. Didn't you tell him that there was a colored nurse who had an account there but this was not the girl? A. No, sir, I did not.

"Q. Did anybody in your store make such a remark? A. I knew that the Mary Lou Hornsby that had the account was colored because I took her application personally.

"Q. And when you went down and told Mary Lou Hornsby, about the time that the police came, that she couldn't cash this draft, you knew at that time that she had an account right there in the store? A. I knew it and I told her that if she wanted to pay that on her account we would be glad to take her check, but it is not the policy of our store to promiscuously cash checks for someone who just walks in and gives us a check to cash. We wouldn't do it for anybody that we didn't know very well. We just don't do that."

Lt. Ira Royals of the Waco Police Department testified to the effect that he was on duty on November 28, 1956, at about 3:00 or 3:30 in the afternoon.

"A. I had been out in one of our police cars and returned to the office

at the City Hall. I recall it to be around four in the afternoon, and a colored girl was sitting in the office by the Sergeant's desk, that girl there at the desk by you, and the information that the Police Department had at that time indicated that this girl was a suspicious person, suspected in a forgery case. * * * The information given me was that the store had called that the girl was there, had presented a check, and further information was that there had been several stores here in Waco that had received checks signed 'Mary Lou Hornsby,' which had turned out to be forged checks, and further information was that a Mr. Walston, who is the Chief of Police at Marlin, Texas, had been here that same day concerning an investigation attempting to locate Mary Lou Hornsby and gathering information about these forged checks. * * *

"Q. Mr. Royals, did you talk to Mary Lou Hornsby down at the police station? A. Yes, sir.

"Q. Did she cooperate with you in every way in your investigation to determine whether or not she was a check forger? * * * A. Yes, sir, I would say her cooperation was satisfactory.

"Q. Did she tell you that there had been some checks forged on her? A. Yes, sir.

"Q. Did she tell you that she had gone to the bank in Marlin and arranged with them to put a code on her checks so there would not be any more checks forged on her? A. Yes, sir.

"Q. Did you call some people in to identify Mary Lou Hornsby? A. Yes, sir.

"Q. Did any of them identify her? A. No, sir.

"Q. After getting that information, did you again contact Mrs. Sharp at the Cinderella Slipper Shop? A. Yes, sir, I called Cinderella Slipper Shop by telephone and did talk to a Mrs. Sharp.

"Q. Did you tell Mrs. Sharp that you thought they were mistaken about this check forger? * * * A. Sir, I don't recall that I told her those exact words. I principally called Mrs. Sharp, or I wanted to talk to someone at the store to find out some more information about the girl and the circumstances, and * * *

"Q. Did Mrs. Sharp tell you that there was a Mary Lou Hornsby who had an account there at their store. A. Yes, sir.

"Q. Did she tell you that it was a white nurse? A. No, sir. * * *

"Q. Did anybody there tell you that there was a Mary Lou Hornsby who was a colored girl and had an account there, but that this was not the girl? A. Yes, sir.

"Q. Who told you that? A. The lady who said she was Mrs. Sharp told me that there was a colored woman who had an account there at the store but said she did not think it was this girl.

"Q. And you placed this girl in the city jail down there, didn't you? A. Yes, sir. * * *

"Q. Did she have any kind of identification on her at all? A. Yes, sir, as we said earlier, she claimed that she had lost her identification about two weeks before, but this afternoon that we were talking to her she did have a credit card, an oil company credit card, I think it was a Gulf, and she had an identification card from the Veterans Hospital at Marlin, and she had something else that had her name on it, as I recall,

it was a receipt from the Highway Department where she had applied for a driver's license, or duplicate driver's license.

"Q. Did she tell you her driver's license had been lost when she lost her other identification? A. I believe so. I think so."

■ We think the foregoing factual situation is ruled by the statement found in Burton v. Roberson, Tex.Com.App., 139 Tex. 562, 164 S.W.2d 524, at page 526, points 2 and 3, 143 A.L.R. 1 (opinion adopted). The rule there stated is: "We think it is a well-recognized principle of law that if one person knowingly joins with another in an enterprise which he should foresee will result in injury to a third person, he is responsible not only for his own acts done in accomplishing the end sought but for all such acts of his associate as well as for the results attained. Wolf v. Perryman, 82 Tex. 112, 17 S.W. 772. Although our precise question was not there raised, Justice Critz, quoting 26 R. C.L., p. 763, sec. 13, announced the general Texas rule in McBeath v. Campbell, Tex.Com.App., 12 S.W.2d 118, 121, as follows: 'It is, and has long been, a general recognized rule that there is no line of separation between the liability of joint tort-feasors. The tort is a thing integral and indivisible, and any claim for injuries arising therefrom runs through and embraces every part of the tort. The liability of one cannot be carried into any portion of the joint tort that is not followed by an equal liability of the other tort-feasors. Each is liable for the whole, and the injured party may pursue one separately, or he may pursue all jointly, or any number less than the whole number.' " Our Supreme Court has not seen fit to change or modify the above rule.

In Landers v. East Texas Salt Walter Disposal Co., 151 Tex. 251, 248 S.W.2d 731, point 734, we find this statement: "The rule of the Robicheaux case [Sun Oil Co. v. Robicheaux, Tex.Com.App., 23 S.W.2d 713] strictly followed, has made it impossible for a plaintiff, though gravely injured, to secure relief in the nature of damages through a joint and several judgment by joining in one suit as defendants *all wrongdoers whose independent tortious acts have joined in producing an injury to the plaintiff, which, although theoretically divisible, as a practical matter and realistically considered is in fact but a single indivisible injury.*" The opinion then expressly overrules the doctrine announced in the Robicheaux case.

■ In Mongomery-Ward & Co. v. Scharrenbeck, 146 Tex. 153, 204 S.W.2d 508, 510, we find this statement: *"While these alleged specific acts of negligence are negative, nevertheless torts may be based on nonfeasance or omissions to act as well as on acts of commission."*

The last expression of our Supreme Court is in accord with the foregoing decisions and is found in Riley v. Industrial Finance Service Co., 302 S.W.2d 652.

■ We think that the foregoing pronouncements by our Supreme Court are peculiarly applicable and controlling to what seems to us an undisputed factual situation insofar as the controlling facts go in this cause. First of all, appellee had been a customer of this store for some time (the exact time not shown). She had an open account and she had recently (November 21, 1956) delivered her personal check for $25 as a payment on her account, which was accepted and paid by the bank on which it was drawn. She had an unpaid balance on her account of $7.90. In view of the relationship existing between her and the store, she was certainly within her rights in making a request of them to honor her check for some cash, realizing that there was no legal obligation upon the part of the store to accommodate her by cashing her check. In addition, she had the foresight to explain to Mrs. Smith the purpose of the notation that she put on the check, which

was to make sure that her signature as written would be known to the bank and its agents cashing her check, and in addition thereto she advised Mrs. Smith that Mr. Peach, an employee of the store, knew her and could identify her, but when Mrs. Sharp came downstairs and saw her and recognized the appellee as being the person who had an account there and told appellee that she could not cash the check but would accept it as a payment on her account, it is our view that this was sufficient recognition on the part of Mrs. Sharp, acting for the store, to make a full disclosure to the Police Department, whom she had called and was responsible for their coming to the store to investigate this party, and she should have quickly advised the officers fully that this party was a customer of the store; that she had an account there, and that she recognized her and was willing to accept the check as a credit on her account. This she wholly failed to do. It is true that neither Mrs. Sharp nor anyone in the store asked the City police to arrest appellee and take her to jail, but they reported to the police that appellee was there trying to cash a check and pointed her out to the officers. When the officers came and found appellee there, and having the other information that had been given to them by the Marlin Chief of Police, they proceeded to take the appellee to the City Hall for questioning and finally placed her in jail. She was detained some five or five and one-half hours. It is our view that when Mrs. Sharp made her report to the Police Department and caused them to come to the store, and having recognized appellee as a customer of the store before the police got there, it was her duty, when they came, to make a full disclosure to the police officers, and having failed to perform this duty it is our view that such failure lead to the false arrest and imprisonment of appellee.

Accordingly, we are of the opinion that the testimony is ample to sustain the findings of the jury and the award it made in damages, and that the judgment of the trial court must be affirmed.

(We have examined each of appellant's authorities, namely, Central Motor Co. v. Roberson, Tex.Civ.App., 154 S.W. 2d 180; Galveston H. & S. A. R. Co. v. Harden, Tex.Civ.App., 236 S.W. 146; Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059; Meyer v. Monnig Dry Goods Co., Tex.Civ.App., 189 S.W. 80; and Zale Jewelry Co. v. Jarman, Tex.Civ.App., 227 S.W.2d 857. It is our view that they are not applicable or controlling in this case by virtue of what we have said. Appellee cites and relies on Newton v. Rhoads Bros., Tex.Com.App., 24 S.W.2d 378; Fox v. McCurnin, 205 Iowa 752, 218 N.W. 499; Dallas Joint Stock Land Bank v. Britton, Tex.Com.App., 134 Tex. 529, 135 S.W.2d 981; Harrer v. Montgomery Ward & Co., 124 Mont. 295, 221 P.2d 428; American Cas. & Life Ins. Co. v. Hastings, Tex.Civ.App., 300 S.W.2d 754.)

All other points raised by appellant are overruled and the judgment of the trial court is affirmed.